Slip Op. 16-85

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **FINE FURNITURE (SHANGHAI) LIMITED, ET AL.,** | |
| Plaintiffs, | |
| and | |
| **METROPOLITAN HARDWOOD FLOORS, INC., ET AL.,** | |
| Plaintiff-intervenors, | **Before: Timothy C. Stanceu, Chief Judge** |
| v. | **Consol. Court No. 14-00135** |
| **UNITED STATES,** | |
| Defendant, | |
| and | |
| **COALITION FOR AMERICAN HARDWOOD PARITY,** | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[Affirming in part, and remanding in part, a determination concluding an administrative review of an antidumping order on multilayered hardwood flooring from the People's Republic of China]

Dated: September 9, 2016

   *Kristin H. Mowry*, Mowry & Grimson, PLLC, of Washington, D.C., for plaintiff Fine Furniture (Shanghai) Limited.  With her on the brief were *Jeffrey S. Grimson*, *Jill A. Cramer*, *Sarah M. Wyss*, and *Daniel R. Wilson*.

   *Gregory S. Menegaz*, deKieffer & Horgan, PLLC, of Washington, D.C., for consolidated plaintiffs Dalian Huilong Wooden Products Co. Ltd., et al.  With him on the brief were *J. Kevin Horgan* and *John J. Kenkel*.

*Thomas J. Trendl*, Steptoe & Johnson LLP, of Washington, D.C., for consolidated plaintiff Shanghai Lizhong Wood Products Co., Ltd./The Lizhong Wood Industry Limited Company of Shanghai.

*Jeffrey S. Neeley*, Husch Blackwell LLP, of Washington, D.C., for consolidated plaintiffs Dalian Kemian Wood Industry Co., et al.

*Lizbeth R. Levinson*, Kutak Rock LLP, of Washington, D.C., for consolidated plaintiff Hangzhou Zhengtian Industrial Co., Ltd. and plaintiff-intervenors Metropolitan Hardwood Floors, Inc., et al.

*Mark Rett Ludwikowski*, Sandler, Travis & Rosenberg, PA, of Washington, D.C., for plaintiff-intervenor Lumber Liquidators Services, LLC.

*Alexander V. Sverdlov*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of counsel on the brief was *Shana Hofstetter*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

*Jeffrey Steven Levin*, Levin Trade Law, P.C., of Bethesda, MD, for defendant-intervenor Coalition for American Hardwood Parity.

Stanceu, Chief Judge:  In this consolidated action,[1] plaintiff Fine Furniture (Shanghai) Limited ("Fine Furniture") and several other Chinese producers or exporters of multilayered wood flooring contest an administrative decision that the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued to conclude the first administrative review of an antidumping duty order on multilayered wood flooring ("subject merchandise") from the People's Republic of China ("China" or the "PRC").

---

[1] Consolidated under Consol. Court No. 14-00135 are: *Metropolitan Hardwood Floors, Inc. et al. v. United States*, Court No.14-00137; *Dalian Kemian Wood Industry Co., Ltd. et al. v. United States*, Court No. 14-00138; *Dalian Huilong Wooden Products Co. Ltd., et al. v. United States*, Court No. 14-00139; and *Shanghai Lizhong Wood Products Co., Ltd./The Lizhong Wood Industry Limited Co. of Shanghai v. United States*, Court No. 14-00172.

# I. BACKGROUND

## A. The Contested Decision

The published decision contested in this action (the "Amended Final Results") is

*Multilayered Wood Flooring from the People's Republic of China: Amended Final Results of the*

*Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 35,314 (Int'l Trade Admin.

June 20, 2014) ("*Amended Final Results*").

## B. Proceedings before the Department of Commerce

Commerce issued an antidumping duty order on multilayered wood flooring from China

(the "Order") on December 8, 2011. *Multilayered Wood Flooring from the People's Republic of*

*China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty*

*Order*, 76 Fed. Reg. 76,690 (Int'l Trade Admin. Dec. 8, 2011).[2]  On January 30, 2013,

Commerce initiated the first periodic administrative review of the Order, for the period of

May 26, 2011 through November 30, 2012 ("period of review" or "POR"). *Initiation of*

*Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in*

*Part*, 78 Fed. Reg. 6,291 (Int'l Trade Admin. Jan. 30, 2013).

---

[2] The antidumping duty order (the "Order") refers to the subject merchandise as "multilayered wood flooring" but states that this merchandise "is often referred to by other terms, *e.g.*, 'engineered wood flooring' or 'plywood flooring.'" *Multilayered Wood Flooring from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 76 Fed. Reg. 76,690, 76,690 (Dec. 8, 2011).  The Order defines these flooring products generally as "composed of an assembly of two or more layers or plies of wood veneer(s)" in which "[t]he several layers, along with the core, are glued or otherwise bonded together to form a final assembled product." *Id.*  The Order explains that "[v]eneer is referred to as a ply when assembled in combination with a core." *Id.*, 76 Fed. Reg. at 76,690 n.2.

Fine Furniture, a producer and exporter of multilayered wood flooring from China, was

one of three mandatory respondents in the first administrative review.  *See* Compl. ¶ 5

(July 7, 2014), ECF No. 9; *Decision Mem. for Prelim. Results of Antidumping Duty*

*Administrative Review: Multilayered Wood Flooring from the People's Republic of China*,

A-570-970, ARP 11-12, at 5 (Nov. 18, 2013), *available at*

http://enforcement.trade.gov/frn/summary/prc/2013-28100-1.pdf (last visited Sept. 6, 2016)

("*Prelim. Decision Mem.*").  The other two mandatory respondents were Armstrong Wood

Products (Kunshan) Co., Ltd. ("Armstrong") and Nanjing Minglin Wooden Industry Co. Ltd.

("Minglin").  *Prelim. Decision Mem.* 5.  Zhejiang Layo Wood Industry Co., Ltd. ("Layo Wood")

filed a request to participate as a voluntary respondent, which Commerce granted.  *Id.*

On November 25, 2013, Commerce published the preliminary results of the review

("Preliminary Results").  *Multilayered Wood Flooring from the People's Republic of China:*

*Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed.

Reg. 70,267 (Nov. 25, 2013) ("*Prelim. Results*").  Commerce preliminarily determined that

imports of subject merchandise from China are being, or are likely to be, sold in the United

States at less than fair value and calculated the following preliminary dumping margins: 0.67%

for Fine Furniture; 8.85% for Layo Wood; and 8.87% for Armstrong.  *Id.*, 78 Fed. Reg.

at 70,268.  Commerce determined that the third mandatory respondent, Minglin, did not sell any

subject merchandise in the United States during the period of review at less than fair value and

assigned it a *de minimis* margin.  *Id.*  Commerce assigned a simple average of the three rates that

were not *de minimis*, 4.77%, to the "separate rate" respondents, i.e., respondents that

demonstrated independence from the government of China but were not assigned individually-

determined margins.  *Id.*, 78 Fed. Reg. at 70,268-69.  Exporters and producers that did not

qualify for separate rate status were assigned the PRC-wide rate, 58.84%.  *Id.*, 78 Fed. Reg. at 70,269.

On May 9, 2014, Commerce published the final results of the review ("Final Results") and accompanying decision memorandum ("Final Decision Memorandum").  *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 26,712 (May 9, 2014) ("*Final Results*") and accompanying *Issues and Decision Mem. for the Final Results of the 2011-2012 Antidumping Duty Admin. Rev. of Multilayered Wood Flooring from the People's Republic of China*, A-570-970, ARP 11-12 (May 9, 2014), *available at* http://enforcement.trade.gov/frn/summary/prc/2014-10698-1.pdf (last visited Sept. 6, 2016) ("*Final Decision Mem.*").  Commerce again determined that imports of subject merchandise from China are being, or are likely to be, sold in the United States at less than fair value. Commerce assigned Fine Furniture a dumping margin of 5.74% and assigned *de minimis* margins to both Minglin and Armstrong.  *Final Results*, 79 Fed. Reg. at 26,714.  In response to the judgment entered in *Baroque Timber Industries (Zhongshan) Co., Ltd. v. United States*, 38 CIT __, 971 F. Supp. 2d 1333 (2014), Commerce amended the less-than-fair-value determination to assign Layo Wood a *de minimis* margin and on that basis excluded from the Order merchandise produced and exported by Layo Wood.  *Id.*, 79 Fed. Reg. at 26,713.  Because Fine Furniture was the only respondent assigned a margin in the Final Results that was not *de minimis*, Commerce assigned a margin of 5.74% to the separate rate respondents as the all-others rate.  *Id.*, 79 Fed. Reg. at 26,714-15.  The PRC-wide rate remained unchanged from the Preliminary Results at 58.84%.  *Id.*, 79 Fed. Reg. at 26,715.

Following several allegations of ministerial errors, Commerce published the Amended

Final Results on June 20, 2014.[3]  *See Amended Final Results*, 79 Fed. Reg. at 35,314.  In the

Amended Final Results, Commerce calculated a revised dumping margin of 5.92% for Fine

Furniture.  *Id.*, 79 Fed. Reg. at 35,316.  Fine Furniture remained the only respondent with a

margin that was other than *de minimis*.  *See id.*  Commerce assigned the separate rate

respondents this revised margin, 5.92%.  *Id.*  The PRC-wide rate remained 58.84%.  *Id.*

### C.  Proceedings before the Court of International Trade

Fine Furniture filed its summons on June 6, 2014 and its complaint on July 7, 2014.

Summons, ECF No. 1; Compl., ECF No. 9.  The other plaintiffs in this case are Chinese

producers and/or exporters of multilayered wood flooring that participated in the underlying

administrative review and received separate rate status.  Metropolitan Hardwood Floors, Inc., et

al., is both a consolidated plaintiff and a plaintiff-intervenor.  Lumber Liquidators, LLC, an

importer of subject merchandise that participated in the underlying administrative review, is also

a plaintiff-intervenor.  The Coalition for American Hardwood Parity, an association of U.S.

producers of multilayered wood flooring and a petitioner in the underlying investigation, is the

defendant-intervenor.

---

[3] The ministerial errors Commerce addressed included an incorrect conversion of units in
the valuation of three of Fine Furniture's inputs (base veneer poplar, base veneer eucalyptus, and
face veneer eucalyptus), the inclusion of the name "Double F" in the instructions sent to U.S.
Customs and Border Protection, and a correction to the names of two separate rate respondents.
*See Final Results of the 2011-2012 Antidumping Administrative Review of Multilayered Wood
Flooring from the People's Republic of China: Allegations of Ministerial Errors*, A-570-970,
ARP 11-12 (June 13, 2014) (Confi. Admin.R.Doc. No. 560).

Fine Furniture moved for judgment on the agency record on November 25, 2014, and

defendant responded on April 27, 2015.[4]  Mot. for J. on the Agency R. Pursuant to R. 56.2 of Pl.

Fine Furniture (Shanghai) Ltd., ECF No. 58 ("Fine Furniture's Br."); Def.'s Resp. to Pl.'s

R. 56.2 Mot. for J. upon the Agency R., ECF No. 73 ("Def.'s Opp'n").  Fine Furniture replied on

July 27, 2015.  Reply Br. in Support of R. 56.2 Mot. for J. upon the Agency R. by Pl. Fine

Furniture (Shanghai) Ltd., ECF No. 80 ("Fine Furniture's Reply").  The court held oral argument

on January 7, 2016.

## II. Discussion

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts Act

of 1980, 28 U.S.C. § 1581(c), under which the court reviews actions commenced under

section 516A of the Tariff Act of 1930 *as amended*, 19 U.S.C. § 1516a, (the "Tariff Act"),

including an action contesting a final determination concluding an administrative review of an

antidumping duty order.[5]  *See* 19 U.S.C. § 1516a(a)(2)(B)(iii).  In reviewing a final

determination, the court "shall hold unlawful any determination, finding, or conclusion

found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).

---

[4] Plaintiffs Dalian Huilong Wooden Products Co., Ltd., et al., also filed, on November 25, 2014, a Motion for Judgment on the Agency Record and a Memorandum of Points and Authorities in Support but merely incorporated the claims and arguments made by Fine Furniture and advanced no independent arguments in support of Fine Furniture's claims. *See* Mot. for J. on the Agency R., ECF No. 61; R. 56.2 Mem. in Support of Mot. for J. on the Agency R., ECF No. 62.

[5] All citations to the United States Code herein are to the 2012 edition.

### B.  Summary of Fine Furniture's Claims

Fine Furniture asserts five claims in contesting the Amended Final Results, arguing as to each that the court must remand the Amended Final Results to Commerce for redetermination.

First, Fine Furniture claims that Commerce, in calculating constructed export price ("CEP"), erred in making a deduction for a value-added tax ("VAT") imposed by the PRC government that exceeded the amount permissible under section 772(c)(2)(B) of the Tariff Act, 19 U.S.C. § 1677a(c)(2)(B).  Fine Furniture's Br. 10-14.

Second, Fine Furniture challenges the Department's choice of surrogate financial statements for use when determining the normal value of Fine Furniture's subject merchandise according to section 773(c) of the Tariff Act, 19 U.S.C. § 1677b(c), which governs the calculation of normal value for goods of nonmarket economy countries.  Fine Furniture argues that Commerce chose financial statements from two Philippine companies for its calculation of surrogate financial ratios for manufacturing overhead, general expenses, and profit that were inferior to financial statements of other Philippine companies and therefore were not the "best available information" as required by 19 U.S.C. § 1677b(c)(1).  *Id.* at 14-30.

Third, Fine Furniture challenges, on various grounds, the Department's applying a "differential pricing" analysis in determining Fine Furniture's weighted average dumping margin and the Department's applying, according to the results of that analysis, an average-to-transaction method of calculating that margin.  *Id.* at 30-37.

Fourth, Fine Furniture asserts that Commerce calculated an inflated surrogate value for brokerage and handling charges by using incorrect data for container weights.  *Id.* at 38-40.

Finally, Fine Furniture claims that Commerce failed to use the best available information in determining a surrogate value for electricity.  *Id.* at 40-45.

C.  The Court Grants in Part, and Denies in Part, Fine Furniture's Motion for Judgment
on the Agency Record

For the reasons discussed below, the court will remand the Amended Final Results for

reconsideration of the deduction for value-added taxes, the choice of financial statements, and

the valuation of electricity.  The court denies relief on Fine Furniture's remaining claims.

1.  The Deduction for Value-Added Taxes

Section 772(c)(2)(B) of the Tariff Act, 19 U.S.C. § 1677a(c)(2)(B), provides that the

price used to establish export price or constructed export price shall be reduced by "the amount,

if included in such price, of any export tax, duty, or other charge imposed by the exporting

country on the exportation of the subject merchandise to the United States . . . ."  19 U.S.C.

§ 1677a(c)(2)(B).  Commerce treats as an "export tax" within the meaning of § 1677a(c)(2)(B) a

portion of any value-added tax imposed by China on manufacturing inputs, to account for the

share of the VAT the manufacturer pays on the inputs that is not refunded upon exportation of

the finished product.  *Final Decision Mem.* 28 (describing China's VAT regime as one "where

some portion of the input VAT that a company pays on purchases of inputs used in the

production of exports is not refunded." (footnote omitted)).  Based on record evidence,

Commerce concluded that in China "the standard VAT levy is 17 percent and the rebate rate for

subject merchandise is nine percent."  *Id.*  Based on this conclusion, Commerce "removed from

U.S. price the difference between the rates (eight percent), which is the irrecoverable VAT as

defined under Chinese law and regulation."  *Id.* (footnote omitted).  Because Commerce

determined the U.S. price for Fine Furniture's subject merchandise according to the constructed

export price method, Commerce made a deduction for unrefunded ("irrecoverable") VAT from

the starting price used to determine CEP, which was the price at which an importer affiliated

with Fine Furniture sold the subject merchandise to unaffiliated U.S. purchasers.  *Analysis for*

*the Final Results of Multilayered Wood Flooring from the People's Republic of China: Fine Furniture (Shanghai) Limited* 2-3, A-570-898, APR 11-12 (May 1, 2014), (Confi. Admin.R.Doc. No. 539) ("*Final Analysis Mem.*").

Fine Furniture does not contest either the Department's practice of treating irrecoverable Chinese VAT as an export tax for purposes of § 1677a(c)(2)(B) or its calculating the deduction from the CEP starting price as the difference between the two rates, i.e., 8%.  The issue Fine Furniture raises in this case is the value to which the 8% should have been applied.  Fine Furniture argues that Commerce unlawfully calculated the export tax deduction according to a formula that failed to comply with § 1677a(c)(2)(B) and was inconsistent with the Department's established practice.  Fine Furniture's Br. 10 (citing *Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*, 77 Fed. Reg. 36,481, 36,482-83 (June 19, 2012)).

Fine Furniture's subject merchandise was sold to a reseller affiliated with Fine Furniture, Double F.  Fine Furniture's Br. 12.  Double F resold the merchandise to the importer, which, as noted above, also was affiliated with Fine Furniture.  *Id.*  Commerce stated in the Final Decision Memorandum that "according to the Chinese tax regulations, irrecoverable VAT is calculated based on the FOB value of the exported good" and that "Fine Furniture, however, reported VAT based on the domestic sales value in China between Fine Furniture and its affiliated reseller." *Final Decision Mem.* 31.  Commerce added that "[a]ccordingly, the domestic sales value is not appropriate for calculating the FOB export sales value." *Id.*

It appears from the record that Commerce, upon rejecting the VAT amount as reported by Fine Furniture, recalculated the deduction from the CEP starting price as 8% of an amount it obtained from the price at which the affiliated importer resold the subject merchandise to

unaffiliated buyers in the United States, which Commerce adjusted downward. *Id.* at 28; *Final Analysis Mem.* 3.  Commerce described the downward adjustment as resulting in "an FOB export value" that is "based on the net FOB U.S. price, exclusive of all expenses and adjustments incurred after the merchandise left the port of exportation in China." *Final Decision Mem.* 31 (citing *Final Analysis Mem.*).

Fine Furniture objects to the Department's method of calculating the VAT deduction on the ground that "Commerce rejected Fine Furniture's true export price upon which VAT was refunded upon export and instead recalculated VAT based on a theoretical value that was distorted by the inclusion of mark-ups for Fine Furniture's affiliated reseller assessed *after exportation*." Fine Furniture's Br. 6 (citing *Final Decision Mem.* at Comment 3).  Fine Furniture characterizes as "false" the Department's finding that the sales value between Fine Furniture and its affiliated reseller is a "domestic sales value." *Id.* at 11.  This value, according to Fine Furniture, is not a domestic sales value because the VAT it reported (and Commerce rejected) was based on the invoiced value from Fine Furniture to the reseller "when the subject merchandise left China, *i.e.*, the true FOB export price of the goods, which accurately reflects the amount of VAT assessed by the GOC [Government of China] pursuant to article 5 of the Provisional Regulations on VAT of the PRC." *Id.*  This value, according to Fine Furniture, "is the only VAT amount that lawfully can be deducted pursuant to the statute." *Id.*

The statute provides that the starting price used to establish CEP "shall be reduced by . . . *the amount*, if included in such price, of any export tax . . . . *imposed by the exporting country* on the exportation of the subject merchandise to the United States." 19 U.S.C. § 1677a(c)(2)(B) (emphasis added).  In this way, Congress expressly limited the deduction for export tax that Commerce is to make by the "amount" of export tax that China actually

"imposed."  The Final Decision Memorandum, however, fails to reconcile the deduction for

irrecoverable VAT that Commerce calculated from the prices paid by Double F to the importer

with the amounts of irrecoverable Chinese VAT that actually were incurred.  There is no

explanation in the Final Decision Memorandum of why the latter amounts may not be

ascertained from record evidence of the VAT payments on the inputs and of the VAT refund

received upon exportation of the finished goods.  Fine Furniture cites record evidence from

which it claims that the export value it reported, i.e., the value in the sales by Fine Furniture to

the affiliated reseller Double F, "accurately reflects the amount of the VAT assessed" by the

Chinese government.  Fine Furniture's Br. 11 (citing *Fine Furniture Sec. C & D*

*Questionnaire* Ex. C-23, *Fine Furniture Sec. C & D Questionnaire Supp.* 2).

     A second problem is the rationale Commerce presented in the Final Decision

Memorandum for its method of calculating the VAT deduction.  Commerce relied on the finding

that the value obtained in a sale between Fine Furniture and its affiliated reseller is a "domestic

sales value" that Commerce considered "not appropriate for calculating the FOB export sales

value." *Final Decision Mem.* 31.  The court is not able to find substantial record evidence to

support this finding.  The Final Decision Memorandum cites none, and Fine Furniture cites

record evidence to the contrary that relates to the operations of Double F.  Fine Furniture's

Br. 11.

     In support of the Department's method of basing the VAT deduction on the sale to the

affiliated importer, defendant argues that "Fine Furniture ignores a critical piece of the record:

namely, the fact that Commerce has previously determined that Fine Furniture and its affiliated

reseller are so intertwined that they should be collapsed into a single entity."  Def.'s Opp'n 19.

Defendant submits that because Fine Furniture does not challenge the decision to treat the two

entities as one, Fine Furniture's "protestations that Commerce's decision to not use the sale between those two companies improperly inflated Fine Furniture's dumping margin fall flat." *Id.* at 19-20.  This argument fails because it offers a rationale different than the one Commerce expressed in the Final Decision Memorandum.  Commerce rejected the use of the transactions between Fine Furniture and Double F for use in determining the VAT deduction because it considered them to be domestic sales transactions rather than sales for export.  It did not reject them because it considered them to be intracompany transfers rather than actual sales. Moreover, defendant's brief, like the Final Decision Memorandum, fails to confront the issue presented by the limitation on the export tax deduction that Congress imposed in 19 U.S.C. § 1677a(c)(2)(B).

Commerce must reconsider its method of determining the export tax deduction and ensure that whatever method it chooses to use complies with the statute and is grounded in findings supported by substantial evidence on the record.

### 2.  Choice of Financial Statements for Determining Surrogate "Financial Ratios"

According to section 773(c)(1) of the Tariff Act, 19 U.S.C. § 1677b(c)(1), Commerce, as a general matter, is to determine the normal value of subject merchandise from a nonmarket economy ("NME")[6] country "on the basis of the value of the factors of production utilized in producing the merchandise," plus "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  Commerce typically calculates surrogate values for factory overhead expenses, for selling, general & administrative ("SG&A") and interest

---

[6] A "nonmarket economy country" ("NME") is defined in 19 U.S.C. § 1677(18)(A) as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."

expenses, and for profit, by calculating and applying "financial ratios" derived from the financial statements of one or more producers of comparable merchandise in the primary surrogate country.  *See* 19 C.F.R. § 351.408(c)(4).  Commerce chose, and none of the parties contests the choice of, the Philippines as the primary surrogate country in this review.  *See Prelim. Decision Mem.* 14.

"In calculating financial ratios for the preliminary results, the Department considered 18 financial statements of Philippine producers of comparable merchandise (*e.g.*, plywood) placed on the record by interested parties," and "[f]ollowing publication of the *Preliminary Results*, interested parties placed an additional seven financial statements on the record for consideration . . . ." *Final Decision Mem.* 21.  "When selecting financial statements for purposes of calculating surrogate financial ratios, the Department's policy is to use data from one or more market economy surrogate companies based on the 'specificity, contemporaneity, and quality of the data.'" *Id.* at 20.  For the Final Results, Commerce concluded that four of the financial statements on the record were specific to the product in question, contemporaneous with the period of review, complete, accurate, and otherwise reliable: the statements from Tagum, Richmond Plywood Corporation ("RPC"), Philippines Softwood Products, Inc. ("PSP"), and Mount Banahaw.  *Id.* at 21-26.

After noting that "the Department has a preference to use financial statements from companies that are at a similar level of integration as the respondents involved in the proceeding," *id.* at 22, Commerce chose to calculate the financial ratios for Fine Furniture using only the financial statements from the two companies it determined were integrated at the same level as Fine Furniture: Tagum and RPC, *id.* at 26.  From these two financial statements, Commerce calculated separate factory overhead expenses, SG&A and interest, and profit ratios

for each of the two Philippine companies and then averaged those ratios to derive a single set of

financial ratios for the calculation of the normal value of Fine Furniture's subject merchandise.

Fine Furniture's claim, stated generally, is that the Department's decision to base the

financial ratios on the Tagum and the RPC financial statements was arbitrary and unsupported by

substantial evidence.  As specific grounds, Fine Furniture argues that the RPC financial

statements were inaccurate and incomplete and that substantial evidence does not support the

Department's finding to the contrary.  Fine Furniture's Br. 16-21.  Second, it argues that the RPC

financial statements should not have been used because record evidence shows that RPC, unlike

Fine Furniture, is not an integrated producer.  *Id.* at 21-22.  Third, Fine Furniture argues that

Commerce erred in rejecting, for various reasons, the use of the financial statements of Mount

Banahaw, Winlex, Industrial Plywood, and Mega Plywood Corporation.  *Id.* at 22-30.

The court must remand the Amended Final Results for reconsideration of the decision to

base Fine Furniture's financial ratios on the financial statements of Tagum and RPC.  The record

indicates that Commerce considered Mount Banahaw to be a non-integrated producer of

comparable products and used Mount Banahaw's financial statements to determine the financial

ratios of non-integrated producers.  In excluding the Mount Banahaw statements from the

calculation of Fine Furniture's financial ratios, Commerce failed to address Fine Furniture's

argument, which was raised in the underlying proceeding by another respondent, Layo Wood,

and adopted by Fine Furniture, that Mount Banahaw actually was an integrated producer.

Between the preliminary and final results, Layo Wood filed a brief with Commerce stating that

Commerce "should only select financial statements from companies with the same level of

integration" as the company under review and that Commerce could "choose to include Mount

Banahaw financial statements" in assessing integrated companies.  *Letter from deKieffer &*

*Horgan to Dep't Commerce re: Multilayered Wood Flooring from China: Case Br.* 7-8

(Jan. 13, 2014) (Admin.R.Doc. No. 608) ("*Layo Case Br.*").  Layo Wood placed on the record in

preliminary surrogate value comments evidence that Mount Banahaw's primary purpose is

"producing, manufacturing, fabricating . . . and otherwise dealing in veneer, plywood, and any

other materials used in the production, manufacturing and fabrication of veneer and plywood."

*Letter from deKieffer & Horgan to Dep't Commerce re: Multilayered Wood Flooring from*

*China: Surrogate Values for the Preliminary Results* Ex. 3 (Aug. 6, 2013) (Admin.R.Doc.

No. 416) ("*Layo Prelim. SV Comments*").  Fine Furniture incorporated the arguments made by

Layo Wood, including the argument that Mount Banahaw is an integrated producer, in its case

brief to Commerce.  *Letter from Mowry & Grimson re: Admin. Review of the Antidumping Duty*

*Order on Multilayered Wood Flooring from the People's Republic of China: Case Br. for*

*Consideration Prior to Final Results* 40 (Admin.R.Doc. No. 606).  Fine Furniture reasserts the

argument that Mount Banahaw is an integrated producer before the court.  Fine Furniture's Br.

22-23.

    As discussed previously, a decision reached in related litigation[7] shortly before the

review was completed ultimately resulted in a *de minimis* margin for Layo Wood in the

underlying investigation, and Commerce therefore excluded Layo Wood from the first review.

*See Final Results*, 79 Fed. Reg. at 26,713.  In the Final Decision Memorandum, Commerce did

not address the argument that Mount Banahaw is an integrated producer.  Instead, it chose the

statements of RPC and Tagum to calculate Fine Furniture's financial ratios, concluding that these

---

    [7] *See Baroque Timber Indus. (Zhongshan) Co. v. United States*, 38 CIT __, 971 F. Supp.
2d 1333, 1339 n.15 (2014) *appeal dismissed sub nom. Zhejiang Layo Wood Indus. Co. v. United
States*, 576 F. App'x 1000 (Fed. Cir. 2014).

companies "are involved in the production of veneer from log sources." *Final Decision Mem.* 26.  Considering Mount Banahaw to be non-integrated, Commerce stated that it used Mount Banahaw's financial statement to calculate the financial ratios for two companies that were "not involved in manufacturing veneers from purchased logs or lumber." *Id.*

Commerce was obligated to consider Fine Furniture's argument that Mount Banahaw is an integrated producer.  *See SKF USA Inc. v. United States*, 630 F. 3d 1365, 1374 (Fed. Cir. 2011).  The court, therefore, remands the Amended Final Results for reconsideration of the decision to base Fine Furniture's financial ratios on the statements of RPC and Tagum. Commerce must reconsider the matter and decide, based on findings supported by substantial record evidence, which financial statement or statements are most appropriate for calculating Fine Furniture's financial ratios.  The court does not consider it necessary at this time to rule on the other grounds Fine Furniture presents as to why it considers unlawful the decision to use only the statements of RPC and Tagum.  Instead, the court will consider the Department's new decision after reviewing the comments of the parties.  It is possible that this decision will moot some of those grounds.

3.  Use of the "Average-to-Transaction" Method to Determine Fine Furniture's Margin Based on a "Differential Pricing Analysis"

Fine Furniture challenges on various grounds the Department's using an "average-to-transaction" comparison method in calculating its dumping margin of 5.92%.  Fine Furniture's Br. 30-37.  Commerce applied the average-to-transaction method based on the results of its "differential pricing" analysis.

Commerce ordinarily determines weighted-average dumping margins, in both antidumping investigations and reviews of antidumping duty orders, by an "average-to-average"

method of comparison, under which it compares the average normal value to the average of export prices or constructed export prices in transactions of the subject merchandise. *See Final Decision Mem.* 7. In some instances, Commerce instead applies, in whole or in part, an "average-to-transaction" method, comparing the export prices or constructed export prices in individual U.S. sales to an average normal value. The Department's purpose in resorting to an average-to-transaction comparison method is to address "potential masking of dumping that can occur when the Department uses the average-to-average method in calculating weighted-average dumping margins." *Prelim. Decision Mem.* 16. Commerce believes this "masking" potentially may occur where there is a pattern of export prices or constructed export prices "for comparable merchandise that differs significantly among purchasers, regions, or time periods." *Id.*

Commerce applies a "Cohen's *d* test" in the first stage of its differential pricing analysis. *Id.* For this review, Commerce explained that "[t]he Cohen's *d* test is a generally recognized statistical measure of the extent of the difference between the mean of a test group and the mean of a comparison group." *Id.* It further explained that "the Cohen's *d* coefficient is calculated to evaluate the extent to which the net prices to a particular purchaser, region, or time period differ significantly from the net prices of all other sales of the comparable merchandise." *Id.* Commerce considered the difference to be significant, and thereby to have "passed" the Cohen's *d* test, if the Cohen's *d* coefficient was equal to or greater than 0.8, i.e., eight-tenths of a standard deviation. *Id.*

Commerce then determined whether "the value of sales to purchasers, regions, or time periods that pass the Cohen's *d* test account for 66 percent of more of the value of total sales." *Id.* If so, Commerce considered applying the average-to-transaction comparison method to all sales of the exporter-producer. *Id.* If that value exceeded 33 percent but was less than 66%,

Commerce considered applying the average-to-transaction comparison method to only those sales that passed the Cohen's *d* test. *Id.* at 16-17.  "If 33 percent or less of the value of total sales passes the Cohen's *d* test, then the results of the Cohen's *d* test do not support consideration of an alternative to the average-to-average method." *Id.* at 17.

For the next phase of the differential pricing analysis, Commerce determined whether there was a "meaningful" difference in the weighted-average dumping margin when calculated according to the average-to-transaction method (to a partial or total extent, as discussed above) instead of the average-to-average method.  If the relative change was 25 percent or more and both rates were above the *de minimis* threshold,[8] Commerce considered the change meaningful and used the average-to-transaction method, either for all U.S. sales of the exporter-producer (if the sales value that passed the Cohen's *d* test were 66% or more of total sales value) or for only the sales that passed the Cohen's *d* test (if the above-described percentage was less than 66% but more than 33%).

For the Final Results,[9] Commerce determined that 38% of Fine Furniture's sales passed the Cohen's *d* test. *Fine Furniture Analysis Mem.* 8.  It further determined that had the average-

---

[8] Commerce stated that it would use the average-to-transaction method "if . . . the resulting weighted-average dumping margin moves above the *de minimis* threshold." *Decision Mem. for Prelim. Results of Antidumping Duty Administrative Review: Multilayered Wood Flooring from the People's Republic of China*, A-570-970, ARP 11-12, at 17 (Nov. 18, 2013), *available at* http://enforcement.trade.gov/frn/summary/prc/2013-28100-1.pdf (last visited Sept. 6, 2016) ("*Prelim. Decision Mem.*").

[9] For the Preliminary Results, Commerce determined that 40.90% of Fine Furniture's U.S. sales by value passed the Cohen's *d* test. *Prelim. Decision Mem.* 17-18.  Commerce determined that the change was meaningful and, therefore, applied the average-to-transaction method to those of Fine Furniture's U.S. sales that passed the Cohen's *d* test and the average-to-average method to its remaining sales. *Id.*  Commerce assigned Fine Furniture a preliminary dumping margin of 0.67%. *Multilayered Wood Flooring from the People's Republic of China:*
     (continued . . .)

to-average method been applied to all of Fine Furniture's sales, the final dumping margin would

have been 1.13%.  *Id.*  Commerce therefore concluded that the difference was meaningful, i.e.,

25% or more, and applied the average-to-transaction method to Fine Furniture's U.S. sales that

passed the Cohen's *d* test and the average-to-average method to the remaining U.S. sales,

resulting in a weighted-average dumping margin of 5.94%.  *Id.*

  Fine Furniture claims that the Department's application of a differential pricing analysis

and the result of that analysis, i.e., the use of the average-to-transaction method when calculating

Fine Furniture's 5.94% dumping margin, were contrary to law.  It raises several arguments in

support of this claim.  Fine Furniture argues, first, that Commerce lacked the authority to apply

its differential pricing analysis (to which Fine Furniture refers as "targeted dumping") in

administrative reviews of antidumping duty orders, as opposed to antidumping duty

investigations "and, as a result, incorrectly compared a portion of Fine Furniture's constructed

export price ('CEP') sales to NV [normal value] using the average-to-transaction method."  Fine

Furniture's Br. 30.  Second, Fine Furniture argues that, even if the Department is permitted to

use a differential pricing analysis in administrative reviews, it may not apply the results of that

analysis to non-dumped sales.  *Id.* at 33-34.  Third, Fine Furniture argues that Commerce may

not use its "zeroing" methodology in applying the average-to-transaction comparison method

because Commerce, adopting a change in policy, abandoned its practice of zeroing in order to

comply with our country's obligations arising out of World Trade Organization ("WTO")

membership.  *Id.* at 35-37.  For the reasons discussed below, the court rejects these arguments.

---

(. . . continued)
*Preliminary Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed.
Reg. 70,267, 70,268 (Nov. 25, 2013).

a.  The Department's Authority to Use the "Average-to-Transaction" Method based upon a
Differential Pricing Analysis

Fine Furniture argues that Commerce lacks statutory authority to apply a differential

pricing analysis in reviews of antidumping duty orders because "[t]he statutory exception that

allows Commerce to conduct differential pricing analyses, and the section Commerce cites to

support its analysis in the Final Results, is [*sic*] an exception that applies only to investigations."

*Id.* at 31.  According to Fine Furniture, the absence of an exception in the provisions in the

statute addressing reviews is not a "gap in the statute" such that the statute could be interpreted

as ambiguous so as to allow Commerce to regulate to fill the gap.  *Id.* at 31-32.  Fine Furniture

maintains that "there is a purposeful inclusion of an exception in the investigation section and an

omission in the review section" signifying that Congress did not intend Commerce to have the

authority to apply differential pricing in reviews.  *Id.* at 32 (citations omitted).

As to each exporter or producer of the subject merchandise that requests that a periodic

administrative review of an antidumping duty order be conducted under section 751 of the Tariff

Act, 19 U.S.C. § 1675, Commerce is required as a general matter to determine the normal value,

export price or constructed export price, and resulting dumping margin, for each entry of the

subject merchandise.  19 U.S.C. § 1675(a)(2)(A)(i), (ii).  As provided in section 777A of the

Tariff Act, 19 U.S.C. § 1677f-1(c), Commerce as a general rule "shall determine the individual

weighted average dumping margin for each known exporter and producer of the subject

merchandise."  In subsection (d) of that section, Congress addressed the method of determining a

weighted average dumping margin in an antidumping duty investigation.  The subsection

provides, as one of two ordinary methods, "comparing the weighted average of the normal values

to the weighted average of the export prices (and constructed export prices) for comparable

merchandise" (i.e., the "average-to-average" method).[10]  *Id.* § 1677f-1(d)(1)(A).  The statute

allows an exception under which, in an investigation, Commerce may use an average-to-

transaction method of comparison if two requirements are met.  Those requirements are that

there be "a pattern of export prices for comparable merchandise that differ significantly among

purchasers, regions, or periods of time," *id.* § 1677f-1(d)(1)(B)(i), and that Commerce explain

"why such differences cannot be taken into account" using one of the two ordinary methods, *id.*

§ 1677f-1(d)(1)(B)(ii).[11]

       As Fine Furniture points out, "there is a purposeful inclusion of an exception in the

investigation section and an omission in the review section."  Fine Furniture's Br. 32.  From this

statutory structure, Fine Furniture concludes that Commerce lacks the authority to use an

---

[10] Section 777A of the Tariff Act, 19 U.S.C. § 1677f-1(d), provides:

   (A) In general – In an investigation under part II of this subtitle, the administering
       authority shall determine whether the subject merchandise is being sold in the United
       States at less than fair value – (i) by comparing the weighted average of the normal
       values to the weighted average of the export prices . . . . or (ii) by comparing the
       normal values of individual transactions to the export prices . . . . of individual
       transactions for comparable merchandise.

   (B) Exception – The administering authority may determine whether the subject
       merchandise is being sold in the United States at less than fair value by comparing the
       weighted average of the normal values to the export prices . . . . of individual
       transactions if (i) there is a pattern of export prices . . . . for comparable merchandise
       that differ significantly among purchasers, regions, or periods of time and (ii) the
       administering authority explains why such differences cannot be taken into account
       using a method described in paragraph (1)(A)(i) or (ii).

19 U.S.C. § 1677f-1(d)(1).

[11] The requirement in § 1677f-1(d)(1)(B)(i) that there be a "pattern of export prices for
comparable merchandise that differ significantly among purchasers, regions, or periods of time,"
is often identified as "targeted dumping."

average-to-transaction comparison method in reviews.  The problem with this conclusion is

twofold.  First, as to reviews of existing antidumping duty orders, the statute not only left out any

exception to normal methods of comparison (while specifying such an exception for

investigations), it also was silent as to the general rule as to which any supposed "exception"

would apply.  That is, Congress made no mention of what are to be the ordinary methods of

comparison when it is a review, as opposed to an investigation, that Commerce is conducting.

"Commerce's decision to apply its average-to-transaction comparison methodology in the

context of an administrative review is reasonable," and "[b]ecause Congress did not provide for a

direct methodology [in administrative reviews], Commerce properly 'fill[ed] th[at] gap.'"  *JBF*

*RAK LLC v. United States*, 790 F.3d 1358, 1364 (Fed. Cir. 2015).  The second problem with Fine

Furniture's argument is that Congress expressly contemplated that Commerce would use an

average-to-transaction method of comparison in certain administrative reviews, providing in

19 U.S.C. § 1677f-1(d)(2) that "[i]n a review under section 1675 of this title, when comparing

export prices . . . . of individual transactions to the weighted average price of sales of the foreign

like product, the administering authority shall limit its averaging of prices to a period not

exceeding the calendar month that corresponds most closely to the calendar month of the

individual export sale."[12]

---

[12] The court notes that Commerce typically does not apply the rule of 19 U.S.C.
§ 1677f-1(d)(2) in the specific instance of an antidumping review of subject merchandise from a
nonmarket economy country (such as this one) because that rule is limited to situations in which
Commerce determines normal value by the ordinary method (using prices in comparison-market
sales of the foreign like product) and after doing so compares U.S. prices in individual
transactions of the subject merchandise to "the weighted average of sales of the foreign like
product."  Nevertheless, the existence of § 1677f-1(d)(2) refutes Fine Furniture's contention that
Congress did not intend for Commerce to use the average-to-transaction comparison method in
administrative reviews of antidumping duty orders.

b.  The Application of the Average-to-Transaction Comparison Method to Non-Dumped Sales

Asserting that "most of Fine Furniture's sales that passed the Cohen's *d* test were not

dumped," i.e., were made at prices at or above normal value, Fine Furniture argues that

Commerce acted contrary to law in applying the average-to-transaction method of comparison to

those of its sales that passed the Cohen's *d* test but also were non-dumped sales.  Fine Furniture's

Br. 33.  Fine Furniture offers three reasons as to why the court must disallow the Department's

applying the average-to-transaction comparison method when the U.S. sale in question was not a

dumped sale.

Fine Furniture maintains, first, that the statute, in 19 U.S.C. § 1677f-1(d)(1)(B), requires

both the requirement of § 1677f-1(d)(1)(B)(i) and that of § 1677f-1(d)(1)(B)(ii) to be met before

Commerce may use the average-to-transaction method for specific sales.  *Id.* at 33-34.  As to its

non-dumped sales that passed the Cohen's *d* test, Fine Furniture contends that Commerce failed

to establish that either requirement was met.  Fine Furniture argues that, as a matter of "plain

meaning," these two statutory requirements "relate to the sub-set of transactions alleged to be

targeted, not the entire universe of transactions."  *Id.* at 33.  This argument fails for two reasons.

As far as "plain meaning" is concerned, the statute plainly provides that the requirements of

§ 1677f-1(d)(1)(B)(i) and § 1677f-1(d)(1)(B)(ii) are binding with respect to investigations, not

reviews (although Commerce has developed a practice under which it relies upon

§ 1677f-1(d)(1)(B) as guidance with respect to use of the average-to-transaction method in

reviews).  Even were § 1677f-1(d)(1)(B) presumed, *arguendo*, to be binding as to reviews, the

"plain meaning" argument still would lack merit.  The reference in subparagraph (i) is to "a

*pattern of export prices* . . . . for comparable merchandise that differ significantly among

purchasers, regions, or periods of time."  19 U.S.C. § 1677f-1(d)(1)(B)(i) (emphasis added).  It is

not a reference confined to sales made at prices that are below normal value.

Fine Furniture next argues that "[t]he only reasonable interpretation of 'targeted

dumping' is sales that are were both targeted and dumped," that sales that were made above the

standard deviation of the Cohen's *d* test or were not dumped cannot be characterized as "targeted

dumped sales," and that the Department's use of the average-to-transaction method as to such

sales is "potentially unreasonable" and "unduly punitive."  Fine Furniture's Br. 34.  Citing

general discussions of "targeted dumping" in preambles to past regulatory issuances by

Commerce, *id.* at 33-34, Fine Furniture grounds its argument in what it believes should be the

Department's policy as to when (if ever) the average-to-transaction method should be used in a

review.  In directing attention to policy questions, Fine Furniture fails to present a plausible

reason why any valid construction of the antidumping statute would limit the use of the average-

to-transaction method in reviews in the way Fine Furniture posits.

For its argument that Commerce must limit the applicability of the average-to-transaction

method to non-dumped sales, Fine Furniture also relies upon a regulation, 19 C.F.R.

§ 351.414(f)(2) (2007), under which Commerce had provided that it "normally will limit the

application of the average-to transaction method to those sales that constitute targeted dumping,"

which the regulation had defined as "a pattern of export prices (or constructed export prices) for

comparable merchandise that differ significantly among purchasers, regions, or periods of time,"

*id.* § 351.414(f)(1)(i).  Fine Furniture's Br. 33-35.  Citing *Gold East Paper (Jiangsu) Co. v.*

*United States*, 37 CIT __, __, 918 F. Supp. 2d 1317, 1327-28 (2013) for the holding that the

Department's attempted withdrawal of this regulation was invalid under the Administrative

Procedure Act, Fine Furniture submits that "Commerce was obligated to apply" this regulation

"in this administrative review." *Id.* at 34.  Fine Furniture's reliance on 19 C.F.R. § 351.414(f)(2)

(2007) is misplaced.  Even if presumed to be still valid, that regulation can have no bearing on

this case because it was expressly limited in application to antidumping investigations, not

reviews.  *See* 19 C.F.R. § 351.414(f)(1) (2007).

   c.  Use of the Average-to-Transaction Method following the Change in "Zeroing" Policy

         Prior to 2012, the Department's default method of comparison in administrative reviews

was the average-to-transaction method.  *See Antidumping Proceedings: Calculation of the*

*Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty*

*Proceedings; Final Modification*, 77 Fed. Reg. 8101, 8101 (Int'l Trade Admin. Feb. 14, 2012)

("*Final Modification*").  When using the average-to-transaction method to calculate a weighted

average dumping margin, Commerce, applying a practice commonly identified as "zeroing,"

treated U.S. sales made at prices above normal value as having "zero" dumping margins, rather

than negative dumping margins, and thereby did not allow these sales to offset the effect of the

positive margins of U.S. sales made at prices below normal value.  *Id.*  On February 14, 2012,

Commerce announced that to comply with WTO obligations it would adopt the average-to-

average methodology (without zeroing) as the new default comparison method for administrative

reviews.  *See Final Modification*, 77 Fed. Reg. at 8101-02.

         Fine Furniture argues that the change in policy as to the use of zeroing renders unlawful

the use of the average-to-transaction method in this review.  Fine Furniture's Br. 35 ("Despite

this change in policy to abandon its zeroing methodology, Commerce continued to use 'zeroing'

in the Final Results by denying offsets in the average-to-transaction method and in so doing

acted contrary to law." (footnote omitted)).  As a second argument, Fine Furniture maintains that

when affirming the use of zeroing in reviews, the Court of Appeals for the Federal Circuit

("Court of Appeals") did so in the context of a review of an antidumping duty order on subject

merchandise from a market economy country.  Where, as here, the merchandise is from a

nonmarket economy country, Fine Furniture argues, "Commerce calculates the average NV that

is compared to the transaction-specific export or constructed export value of the U.S. sale using a

monthly average, but in NME cases, Commerce uses a value covering the entire period of

review, which in this case is eighteen months."  *Id.* at 36.  According to Fine Furniture, this

longer time frame for calculating average normal value "tends to artificially drive some sales

below [fair] value and others above fair value" and "exacerbates distortions that are caused by

the use of 'average-to-transaction' comparisons."  *Id.* at 36-37.  "To further zero negative

margins only piles on the unreasonableness to NME respondents."  *Id.* at 37.

      Fine Furniture's first argument mischaracterizes the change in policy as to the use of

zeroing in reviews.  Fine Furniture submits that "Commerce has recognized that 'the denial of

offsets [i.e., zeroing] for non-dumped comparisons in reviews {is} inconsistent with the United

States' WTO obligations.'"  Fine Furniture's Br. 35 (quoting *Final Modification*, 77 Fed Reg.

at 8101-02).  However, the language Fine Furniture quotes is in the context of a paragraph in

which Commerce summarized the findings of the WTO Appellate Body in several WTO

disputes and does not summarize accurately the change in policy Commerce announced.  That

policy change did not abandon entirely the practice of zeroing in reviews of antidumping duty

orders but instead announced that the average-to-average comparison method would be the new

default method for these reviews.  *See Final Modification*, 77 Fed. Reg. at 8102 ("In reviews,

*except where the Department determines that application of a different comparison method is*

*more appropriate*, the Department will compare monthly weighted-average export prices with

monthly weighted-average normal values, and will grant an offset . . . ." (emphasis added)).

Fine Furniture's second argument is also meritless.  Fine Furniture cites no authority, whether from statute, regulations, or judicial precedent, for the novel proposition that Commerce lacks authority to apply its zeroing methodology in administrative reviews of antidumping duty orders on merchandise from nonmarket economy countries.

The judicial precedent that exists, in which the Court of Appeals repeatedly has affirmed the Department's use of zeroing when applying the average-to-transaction method of comparison in reviews, arises from market economy cases but does not provide a basis for the distinction Fine Furniture urges the court to draw in this case.  *See Union Steel v. United States*, 713 F.3d 1101, 1104 (Fed. Cir. 2013); *see also SKF USA Inc.*, 630 F.3d at 1375 (holding that Commerce had statutory authority to apply zeroing in conjunction with the average-to-transaction methodology in administrative review of antidumping duty orders on ball bearings from France and Germany regardless of change in policy on zeroing in investigations); *Timken Co. v. United States*, 354 F.3d 1334 (Fed. Cir. 2004) (holding the Department's zeroing practice to be a reasonable interpretation of the statute, 19 U.S.C. § 1677(35)(A)).

In its Reply Brief, plaintiff argues that, even if permissible under *Union Steel*, the Department's use of zeroing was unlawful because Commerce failed to "explain its decision to use zeroing" in this review.  Fine Furniture's Reply 22.  An "agency must examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'"  *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  Commerce stated in the Final Decision Memorandum that it believed its use of the average-to-transaction method with zeroing was based on a permissible interpretation of the statute, citing *Union Steel*, 713 F.3d at 1106, as support.  *Final Decision*

*Mem.* 17.  Commerce specifically addressed the argument that zeroing should not be adopted in nonmarket economy cases due to the longer period for calculation of normal value in nonmarket economy reviews, pointing out that a longer period is also used for the normal value calculation in constructed value cases, that "even the review underlying the *Union Steel* decision involved the use of constructed value," and that "[a]lthough the Department modified its cost-calculation methodology in that review, the Department's normal practice [for constructed value] is to calculate an annual weighted average cost for the POR."  *Id.*  Thus, Commerce provided a satisfactory explanation for its decision to apply zeroing in this review.

### 4.  The Surrogate Value for Brokerage & Handling

Under section 772(c)(2) of the Tariff Act, 19 U.S.C. § 1677a(c)(2)(A), Commerce is to reduce constructed export price by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."  In calculating Fine Furniture's constructed export price, Commerce deducted an amount representing domestic (Chinese) brokerage and handling ("B&H") expenses from the gross unit price paid by Fine Furniture's first unaffiliated purchasers in the United States.  *See Prelim. Decision Mem.* 19.  Because it regards China as a nonmarket economy country, Commerce calculated a surrogate value for these expenses, using for this purpose a 2013 World Bank report, "Doing Business in the Philippines" ("Doing Business Report").  *See Final Decision Mem.* 31-36.  This report specifies costs associated with brokerage and handling in the Philippines and provides rates calculated in U.S. dollars per container.  *See Petitioner's Comments on Surrogate Value* Ex. 2 (May 24, 2013), (Admin.R.Doc. No. 310).  The information in the World Bank Doing Business Report is based on an assumption that a typical

20-foot shipping container weighs 10,000 kg.  *Id.*  Commerce converted the per-container cost to

a per-kilogram cost before making the adjustment to constructed export price.  *See Final Results*

*Surrogate Value Mem.* 2-3 (May 1, 2014), (Admin.R.Doc. No. 645).

Fine Furniture argues that the Doing Business Report was not the best available data

source on the record, for two reasons.  First, Fine Furniture argues that Commerce erred in

"using a hypothetical container weight of 10,000 kilograms per 20 foot container" as provided in

the Doing Business Report "instead of the actual weight of a typical 20 foot container" in data

submitted by Fine Furniture.  *See* Fine Furniture's Br. 38, 40.  Fine Furniture proposes that

instead Commerce should have used a per-container weight of 25,044 kg., which it describes as

the standard maximum load for a twenty foot container.  *See Letter from Mowry & Grimson re:*

*Admin. Review of the Antidumping Duty Order on Multilayered Wood Flooring from the*

*People's Republic of China: Surrogate Value Comments* Ex. SV-8, (May 24, 2013),

(Admin.R.Doc. No. 300).

Use of the alternative container weight proposed by Fine Furniture would not have been

justified on this record, which lacks any evidence to support a finding that containers carrying

Fine Furniture's subject merchandise typically were filled to the maximum weight capacity of

the containers and that each container weighed more than 25,000 kg.  In contrast, the record

contains actual evidence that a typical container weighs 10,000 kg., consisting of the Doing

Business Report and price quotes for two logistics companies.  *Final Decision Mem.* 33.  This

evidence provides the necessary evidentiary support for the Department's conversion of the per-

container cost for brokerage and handling expenses to a per-kilogram cost using a 10,000 kg.

container weight.

Fine Furniture also argues that Commerce should not have converted brokerage and handling costs to a per-kilogram quantity because "information on the record shows that the commercial reality of the [multilayered wood flooring] industry is that B&H costs are not determined on the basis of weight." Fine Furniture's Br. 38-39.  Fine Furniture cites an affidavit submitted by another respondent in a brief commenting on surrogate values, to which are attached price quotes for brokerage and handling based on a per-container cost rather than a per-kilogram cost.  *See Letter from deKieffer & Horgan to Dep't Commerce re: Resubmission of Surrogate Values for the Final Results per the Department's letter dated January 8, 2014* Ex. 9 (Jan. 10, 2014), (Admin.R.Doc. No. 599).

Commerce considered Fine Furniture's argument during the review and found that the brokerage and handling information in the Doing Business Report remained the best available information on the record.  *Final Decision Mem.* 33-34.  Commerce stated that "upon reviewing the referenced price quotes, we found insufficient evidence to warrant a finding that the charges of B&H in the Philippines are exclusively on a container basis, irrespective of the weight loaded on a container, as respondents claim." *Id.*  "With regard to *Doing Business 2013*, the Department determined that 10,000 kg should continue to be used to calculate the B&H surrogate value because this is the weight of the shipment in a 20-foot container for which participants in the *Doing Business 2013* survey reported B&H costs." *Id.* at 35 (footnotes omitted).  The explanation of the methodology used to derive the brokerage and handling costs in the Doing Business Report, which was placed on the record by another respondent, supports this finding, stating: "Assumptions about the traded goods.  The traded product travels in a dry-cargo, 20-foot, full container load.  It weighs 10 tons and is valued at $20,000." *See Letter from DeKieffer & Horgan to Sec. of Commerce Pertaining to Layo Wood Surrogate Data – Part 6* Ex. 13

"Trading Across Borders Methodology" (Aug. 6, 2013), (Admin.R.Doc. No. 420).  Commerce,

therefore, relied on substantial record evidence in finding that it was appropriate to calculate a

surrogate value for brokerage and handling costs based on weight.  The price quotes upon which

Fine Furniture bases its argument are evidence that B&H costs sometimes are paid on a per-

container basis, but Commerce permissibly found according to the record evidence as a whole

that a per-kilogram value based on the Doing Business Report data, in light of the way in which

those data were reported, was more representative of B&H costs for Philippine shipments in

general and therefore more suitable for use in calculating a B&H surrogate value.

### 5.  The Surrogate Value for Electricity

According to section 773(c)(1) of the Tariff Act, 19 U.S.C. § 1677b(c)(1), Commerce, as

a general matter, is to determine the normal value of subject merchandise from a nonmarket

economy country "on the basis of the value of the factors of production utilized in producing the

merchandise," plus certain additions.  The statute further states that "the valuation of the factors

of production shall be based on the best available information regarding the values of such

factors in a market economy country or countries considered to be appropriate by the

administering authority."  19 U.S.C. § 1677b(c)(1).  When choosing a source of data from the

surrogate country to value a factor of production, Commerce has a preference for data that is

"publicly available, contemporaneous with the POR, represents a broad market average, from an

approved surrogate country, tax and duty-exclusive, and specific to the input" being valued.

*Prelim. Decision Mem.* 13.

Fine Furniture argues that the Department's choice of a surrogate value for electricity

was unsupported by substantial evidence because it was not the best available data source on the

record.  There were two possible sources of data: data from the Philippines National Power

Corporation ("NPC") and data from the Doing Business in Camarines Sur site ("Doing

Business").[13] *See Final Decision Mem.* 58-60.  Commerce chose to rely on the Camarines Sur

Doing Business data, finding that they were superior to the National Power Corporation data

because the Doing Business data "reflect prices for residential, commercial and industrial users,

which offer a greater specificity than NPC."[14] *Id.* at 59.

   "Congress has vested Commerce with considerable discretion in selecting the 'best

available information' for use in valuing factors of production." *Allied Pacific Food (Dalian)*

*Co. Ltd. v. United States*, 32 CIT 1328, 1342, 587 F. Supp. 2d 1330, 1339 (2008) (citing *Nation*

*Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999)).  Nevertheless, the

Department's findings as to the "best available information" must be supported by substantial

record evidence.  Fine Furniture argues that the Doing Business data were not the best available

data on the record for three reasons: (1) they do not represent a broad market average; (2) they

are not contemporaneous with the period of review; and (3) there is no evidence on the record

that the Doing Business electricity rates were calculated exclusive of taxes and duties.

---

   [13] Respondents also proposed using data from the Manila Electricity Company
("Meralco") to value electricity, but the Department rejected this proposal because there was "no
source information available on the record provided by any interested party." *Issues and
Decision Mem. for the Final Results of the 2011-2012 Antidumping Duty Admin. Rev. of
Multilayered Wood Flooring from the People's Republic of China*, A-570-970, ARP 11-12, at 59
(May 9, 2014), *available at* http://enforcement.trade.gov/frn/summary/prc/2014-10698-1.pdf
(last visited Sept. 6, 2016).

   [14] The "Doing Business in Camarines Sur" data was published on the Camarines Sur
provincial government's website, www.camarinessur.gov/ph, but is no longer publicly accessible
at that address.  Petitioners submitted a screenshot of the site, accessed on August 12, 2012, to
the record.  *See Petitioner's Comments on Surrogate Value*, A-570-970, ARP 11-12, Ex. 1
(May 24, 2013), (Admin.R.Doc. No. 310).

First, Fine Furniture argues that the National Philippines Corporation data are superior as more broadly representative of electricity costs in the Philippines geographically because the National Philippines Corporation data covers the main grid rates for all three main regions in the Philippines and because the record shows there are regional differences in the pricing and consumption of electricity.  *See* Fine Furniture's Br. 41-42.  In contrast, the Camarines Sur Doing Business data covered only a single region, Camarines Sur.  *Id.* at 41.  Commerce found that the Camarines Sur data are more specific than the National Philippines Corporation data because the former "reflect prices for residential, commercial, and industrial users" while the latter "provide only a single effective rate based on unbundled rates for the Luzon, Mindanao and Visayas power grids."  *Final Decision Mem.* 59.

Second, Fine Furniture argues that the data were not contemporaneous with the period of review because the Doing Business site lists only a single current rate that was effective "as of" 2009.  *See* Fine Furniture's Br. 41.  Defendant argues that Commerce "found the Doing Business data to be contemporaneous to the period relevant here in a parallel proceeding," specifically, the 2011-2012 administrative review of the Department's antidumping duty order on chlorinated isocyanurates from China.  Def.'s Opp'n 34-35 (citing *Decision Mem. for the Final Results of Antidumping Duty Administrative Review: Chlorinated Isocyanurates from the People's Republic of China, 2011-12*, A-570-898, APR 11-12, at 19 (Jan. 30, 2014), *available at* http://enforcement.trade.gov/frn/summary/prc/2014-01898-1.pdf (last visited Sept. 6, 2016) ("*Chlorinated Isocyanurates Final Decision Mem.*")).  In the Final Decision Memorandum of that proceeding, Commerce stated as follows:

> The Department continues to find the Camarines Sur data to be contemporaneous as explained in the previous review, noting that the Department has found that utility rates represent a current rate as indicated by the effective date listed for each of the rates

provided.  Therefore, in the Department's estimation, the rates from the publication likely were, absent evidence to the contrary, effective beginning in 2009, and thus continued to represent the current rate during the POR.

*Chlorinated Isocyanurates Final Decision Mem.* 19.

Finally, Fine Furniture argues that the Doing Business data are inferior to the National Philippines Corporation data because there is no record evidence that the Doing Business data used to calculate electricity rates are exclusive of taxes or duties, which Fine Furniture submits that the National Philippines Corporation data are, *see* Fine Furniture's Br. 42, and because the Doing Business site "provides no information regarding the source of methodology behind its rate reporting." *Id.* at 43.  Here, Commerce acknowledged that Fine Furniture presented the argument on tax and duty exclusivity yet failed to address it.  *See Final Decision Mem.* 58-60.  Again, when a party properly raises an argument before an agency, that agency is required to address the argument in its final decision.  *SKF USA Inc.*, 630 F. 3d at 1374 (citing *Timken U.S. Corp. v. United States*, 421 F. 3d 1350, 1358 (Fed. Cir. 2005)).  Commerce must consider on remand the argument Fine Furniture grounds in a claimed lack of record evidence that the Camarines Sur Doing Business rates are exclusive of taxes and duties.  The court does not consider it necessary at this time to rule on the other grounds Fine Furniture presents as to why the Doing Business data are not the best available data on the record to value electricity as these arguments may be rendered moot by the Department's decision on remand.

### III. CONCLUSION

For the reasons discussed in the foregoing, the court remands the Amended Final Results published as *Multilayered Wood Flooring from the People's Republic of China: Amended Final Results of the Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 35,314 (June 20, 2014) ("*Amended Final Results*") for reconsideration of the calculated deduction for

value-added taxes, the choice of financial statements, and the valuation of electricity.  Upon

consideration of all papers and proceedings in this case, and upon due deliberation, it is hereby

**ORDERED** that Fine Furniture's motion for judgment on the agency record be, and hereby is, granted in part and denied in part; it is further

**ORDERED** that the *Amended Final Results* be, and hereby are, set aside as unlawful and remanded for reconsideration and redetermination in accordance with this Opinion and Order; it is further

**ORDERED** that Commerce shall issue, within ninety (90) days of the date of this Opinion and Order, a new determination upon remand ("Remand Redetermination") that conforms to this Opinion and Order and redetermines as necessary the dumping margins of Fine Furniture and the plaintiffs who are separate rate respondents; it is further

**ORDERED** that plaintiffs, plaintiff-intervenors, and defendant-intervenor may file comments on the Remand Redetermination within thirty (30) days from the date on which the Remand Redetermination is filed with the court; and it is further

**ORDERED** that defendant may file a response to the comment submissions within fifteen (15) days from the date on which the last of any such comments is filed with the court.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated: September 9, 2016
New York, New York