Slip Op. 18-68

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **FINE FURNITURE (SHANGHAI) LIMITED, ET AL.,** | |
| Plaintiffs, | |
| and | |
| **METROPOLITAN HARDWOOD FLOORS, INC., ET AL.,** | |
| Plaintiff-Intervenors, | **Before: Timothy C. Stanceu, Chief Judge** |
| v. | **Consol. Court No. 14-00135** |
| **UNITED STATES,** | |
| Defendant, | |
| and | |
| **COALITION FOR AMERICAN HARDWOOD PARITY,** | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[Sustaining in part, and remanding to the agency in part, a decision issued in response to court order in litigation contesting a final determination in an administrative review of an antidumping duty order]

Dated:June 12, 2018

*Kristin H. Mowry*, Mowry & Grimson, PLLC, of Washington, D.C., for plaintiff Fine Furniture (Shanghai) Limited.  With her on the brief were *Jeffrey S. Grimson*, *Jill A. Cramer*, and *Sarah M. Wyss*.

*Gregory S. Menegaz*, deKieffer & Horgan, PLLC, of Washington, D.C., for plaintiffs Dalian Huilong Wooden Products Co. Ltd., et al.  With him on the brief were *J. Kevin Horgan* and *John J. Kenkel*.

*Thomas J. Trendl*, Steptoe & Johnson LLP, of Washington, D.C., for plaintiff Shanghai Lizhong Wood Products Co., Ltd./The Lizhong Wood Industry Limited Company of Shanghai.

*Jeffrey S. Neeley*, Husch Blackwell LLP, of Washington, D.C., for plaintiffs Dalian Kemian Wood Industry Co., Ltd., et al.

*Lizbeth R. Levinson*, Kutak Rock LLP, of Washington, D.C., for plaintiff Hangzhou Zhengtian Industrial Co., Ltd., and plaintiff-intervenors Metropolitan Hardwood Floors, Inc., et al.  With her on the brief was *Ronald M. Wisla*.

*Mark R. Ludwikowski*, Sandler Travis & Rosenberg, P.A., of Washington, D.C., for plaintiff-intervenor Lumber Liquidators Services, LLC.

*Tara K. Hogan*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. On the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.

*Jeffrey S. Levin*, Levin Trade Law, P.C., of Bethesda, MD, for defendant-intervenor Coalition for American Hardwood Parity.

Stanceu, Chief Judge: In this consolidated case,[1] plaintiff Fine Furniture (Shanghai)

Limited ("Fine Furniture") and numerous other Chinese companies that are producers or

exporters of multilayered wood flooring contested a decision of the International Trade

Administration, U.S. Department of Commerce ("Commerce" or the "Department") in an

antidumping duty proceeding.  The contested decision concluded the first periodic administrative

review of an antidumping duty order on multilayered wood flooring ("subject merchandise")

from the People's Republic of China ("China" or the "PRC").  *Multilayered Wood Flooring*

*From the People's Republic of China: Final Results of Antidumping Duty Administrative*

*Review; 2011-2012*, 79 Fed. Reg. 26,712 (Int'l Trade Admin. May 9, 2014) ("*Final Results*");

---

[1] Consolidated under Consol. Court No. 14-00135 are: *Metropolitan Hardwood Floors, Inc., et al. v. United States*, Court No.14-00137; *Dalian Kemian Wood Industry Co., Ltd., et al. v. United States*, Court No. 14-00138; *Dalian Huilong Wooden Products Co. Ltd., et al. v. United States*, Court No. 14-00139; and *Shanghai Lizhong Wood Products Co., Ltd./The Lizhong Wood Industry Limited Co. of Shanghai v. United States*, Court No. 14-00172.

*Multilayered Wood Flooring From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 35,314 (Int'l Trade Admin. June 20, 2014) ("*Amended Final Results*").

Before the court is the Department's decision in response to the court's opinion and order in *Fine Furniture (Shanghai) Ltd. v. United States*, 40 CIT __, 182 F. Supp. 3d 1350 (2016) ("*Fine Furniture I*") and the court's opinion in *Fine Furniture (Shanghai) Ltd. v. United States*, 41 CIT __, 2017 WL 2928783 (July 7, 2017) (Op. and Order on Def.'s Mot. to Clarify or, in the Alternative, Mot. for Voluntary Remand) ("*Fine Furniture II*").  *Final Results of Redetermination Pursuant to Court Order* (Aug. 28, 2017), ECF Nos. 337-1 (conf.), 338-1 (public) ("*Remand Redetermination*").

The court sustains the Remand Redetermination with respect to three decisions Commerce made in the Remand Redetermination and issues a second remand order with respect to a fourth decision.

## I. BACKGROUND

The background of this action is set forth in the court's prior opinions and summarized and supplemented herein.  *See Fine Furniture I*, 40 CIT __, 182 F. Supp. 3d 1350 (2016); *Fine Furniture II*, 41 CIT __, 2017 WL 2928783 (July 7, 2017).

### A. The Antidumping Duty Order and the First Administrative Review

Commerce issued the antidumping duty order on multilayered wood flooring from China (the "Order") on December 8, 2011.[2]  *Multilayered Wood Flooring From the People's Republic*

---

[2] The antidumping duty order (the "Order") identifies the subject merchandise as "multilayered wood flooring" but states that this merchandise "is often referred to by other terms, e.g., 'engineered wood flooring' or 'plywood flooring.'"  *Multilayered Wood Flooring from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair* (continued . . .)

*of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 76 Fed. Reg. 76,690 (Int'l Trade Admin. Dec. 8, 2011).

Commerce published the final results of the first administrative review and an accompanying Issues and Decision Memorandum on May 9, 2014. *Final Results* and accompanying *Issues and Decision Mem. for the Final Results of the 2011-2012 Antidumping Duty Admin. Rev. of Multilayered Wood Flooring from the People's Republic of China*, A-570-970, ARP 11-12 (May 9, 2014), *available at* http://enforcement.trade.gov/frn/summary/prc/2014-10698-1.pdf (last visited June 6, 2018) ("*Final I&D Mem.*"). Commerce issued the Amended Final Results in response to allegations of ministerial errors. *Amended Final Results*, 79 Fed. Reg. at 35,314-15.

<u>B. Dumping Margins Assigned in the Amended Final Results</u>

Plaintiff Fine Furniture is a Chinese producer and exporter of multilayered wood flooring and one of three mandatory respondents in the first review. *See Final Results*, 79 Fed. Reg. at 26,712-13. In the Amended Final Results, Commerce assigned Fine Furniture a dumping margin of 5.92% and *de minimis* margins to the other two mandatory respondents. *Amended Final Results*, 79 Fed. Reg. at 35,315-16. Because Fine Furniture was the only individually-examined respondent assigned a margin that was not *de minimis*, Commerce assigned this 5.92% rate to 69 "separate rate" respondents, who were reviewed Chinese producers or exporters of multilayered wood flooring that established independence from the

-----

(. . . continued)
*Value and Antidumping Duty Order*, 76 Fed. Reg. 76,690 (Int'l Trade Admin. Dec. 8, 2011). The Order defines these flooring products generally as "composed of an assembly of two or more layers or plies of wood veneer(s)" in which "[t]he several layers, along with the core, are glued or otherwise bonded together to form a final assembled product." *Id.* The Order explains that "[v]eneer is referred to as a ply when assembled." *Id.*, 76 Fed. Reg. at 76,690 n.2.

government of the PRC but that did not receive individually-determined dumping margins in the first review.  *Id.*

## C. The Parties to this Consolidated Case

Fine Furniture and 42 of the 69 separate rate respondents (collectively, the "Separate Rate Plaintiffs") are plaintiffs, plaintiff-intervenors, or both, in this litigation.  The Coalition for American Hardwood Parity (the "Coalition"), an association of U.S. producers of multilayered wood flooring that was the petitioner in the antidumping duty investigation, is a defendant-intervenor.  Lumber Liquidators, LLC, an importer of the subject merchandise, is a plaintiff-intervenor.

## D. The Court's Opinion and Order in *Fine Furniture I*

In *Fine Furniture I*, the court ordered Commerce to reconsider (1) its calculation of a deduction for Chinese irrecoverable value-added tax ("VAT") in determining the constructed export price ("CEP") of Fine Furniture's sales of subject merchandise, (2) its selection of financial statements for purposes of calculating surrogate financial ratios, and (3) its choice of a surrogate value ("SV") for Fine Furniture's electricity usage.  40 CIT at __, 182 F. Supp. 3d at 1356-61, 1369-71.

Following defendant's subsequent motion requesting clarification regarding the scope of the court's remand order, the court issued an additional opinion addressing defendant's inquiry pertaining to the court's instruction that Commerce "decide, based on findings supported by substantial record evidence, which financial statement or statements are most appropriate for calculating Fine Furniture's financial ratios."  *Fine Furniture II*, 41 CIT __, 2017 WL 2928783 at *3 (quoting *Fine Furniture I*, 40 CIT at __, 182 F. Supp. 3d at 1361); *see also* Def.'s Partial Consent Mot. for Clarification or, in the Alternative, Mot. for Voluntary Remand (Nov. 18,

2016), ECF No. 327.  The court explained that *Fine Furniture I* afforded broad discretion for the

Department to reconsider its selection of financial statements used to determine surrogate values

for profit, overhead, and selling, general & administrative expenses upon remand.  *Fine*

*Furniture II*, 41 CIT __, 2017 WL 2928783 at *3.

### E. The Remand Redetermination

The Department filed its Remand Redetermination on August 28, 2017.  *Remand*

*Redetermination*.  In the Remand Redetermination, Commerce (1) revised its deduction for

irrecoverable value-added tax to correspond to the information reported by Fine Furniture,

(2) provided further explanation regarding its selection of a surrogate value for Fine Furniture's

electricity usage, and (3) revised its selection of surrogate financial statements.  *Id.* at 1-2, 14-15.

As a result of these changes, Commerce calculated a 0.73% dumping margin for Fine Furniture.

*Id.* at 26.  The Department decided in the Remand Redetermination to assign this rate to the

separate rate respondents "involved in the litigation."  *Id.* at 26-28 (including Attachment titled

"List of Separate Rate Respondents with Updated Rates" identifying 47 separate rate

respondents).[3]

### F. Comments on the Remand Redetermination

Fine Furniture filed comments on the Remand Redetermination on September 27, 2017.

Comments of Pl. Fine Furniture (Shanghai) Ltd. on Final Results of Remand Redetermination

---

[3] Of the 47 separate rate respondents listed, 41 are plaintiffs or plaintiff-intervenors in this action (Hangzhou Zhengtian Industrial Co., Ltd., a plaintiff in this action, appears to have been omitted).  *See* Amended Summons at 2, *Metropolitan Hardwood Floors, Inc., et al. v. United States*, Court No. 14-00137 (July 11, 2014), ECF No. 18.  The Department's list also includes the following 6 separate rate respondents that, based on the summonses and complaints, do not appear to be parties to this action: Chinafloors Timber (China) Co. Ltd., Guangdong Yihua Timber Industry Co., Ltd., Huzhou Jesonwood Co., Ltd., Zhejiang Biyork Wood Co., Ltd., Zhejiang Dadongwu Green Home Wood, and Zhejiang Tianzhen Bamboo & Wood. *Remand Redetermination* at 27-28.

Pursuant to Court Order (Sept. 27, 2017), ECF No. 340 ("Fine Furniture's Comments").  In its

comments, Fine Furniture (1) agreed with the Department's revised calculation of the deduction

for irrecoverable VAT, (2) objected, in part, to the Department's selection of financial statements

for purposes of calculating financial ratios, and (3) objected to the Department's surrogate value

for the electricity factor of production.  *Id.* at 1-2.  The Separate Rate Plaintiffs filed comments

expressing support for Fine Furniture's comments and indicating that any rate determination

made as to Fine Furniture should be applied to Separate Rate Plaintiffs as well.  *See* Notices of

Consolidated Pls.' and Pl.-Intervenors' Statements of Support of Pl.'s Comments on Remand

Results (Sept. 27, 2017), ECF Nos. 341-343.  The Coalition did not file comments on the

Remand Redetermination.

On October 19, 2017, defendant filed a reply responding to Fine Furniture's comments

and requesting that the court sustain the Department's Remand Redetermination.  Def.'s Reply to

Comments on Remand Redetermination 1-2 (Oct. 19, 2017), ECF No. 346 ("Def.'s Reply").

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts Act

of 1980, 28 U.S.C. § 1581(c), under which the court reviews actions commenced under

section 516A of the Tariff Act of 1930, *as amended*, 19 U.S.C. § 1516a, including an action

contesting the final results of an administrative review that the Department issues under

section 751 of the Tariff Act, 19 U.S.C. § 1675(a).[4]  In reviewing an agency determination in an

antidumping duty review, the court "shall hold unlawful any determination, finding, or

---

[4] Citations to the United States Code herein are to the 2012 edition.

conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol.*

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

### B. The Court Sustains the Remand Redetermination in Part and Orders a Second Remand to Commerce

In the Remand Redetermination, the Department reconsidered its methodology for

calculating irrevocable VAT for purposes of calculating EP and CEP under 19 U.S.C.

§ 1677a(c)(2)(B). *Remand Redetermination* at 7-9. The Department also revised its analysis

concerning surrogate financial statements, choosing to select a different set of statements than it

used in the Final Results and declining to rely on certain other statements on the record. *Remand*

*Redetermination* at 17-20. The court sustains the Remand Redetermination in both respects.

Concluding that the Department's surrogate value for electricity usage was not determined

according to the best available evidence on the record, the court directs Commerce to reconsider

and redetermine that surrogate value. Finally, the court sustains the Department's decision to

apply to the Separate Rate Plaintiffs a rate equivalent to the margin for Fine Furniture.

### 1. Deduction for Value-Added Taxes in Calculation of Export Price

Section 772(c)(2)(B) of the Tariff Act, 19 U.S.C. § 1677a(c)(2)(B), provides that the

price used to establish export price or constructed export price (the "starting price") shall be

reduced by "the amount, if included in such price, of any export tax, duty, or other charge

imposed by the exporting country on the exportation of the subject merchandise to the United

States." 19 U.S.C. § 1677a(c)(2)(B). In the Final Results, the Department treated as an "export

tax, duty or other charge" within the meaning of § 1677a(c)(2)(B) a value-added tax imposed by

China on manufacturing inputs to the extent it found this value-added tax to be unrefunded

("irrecoverable") upon the exportation of the finished product. *See Final I&D Mem.* at 28-29.

Commerce concluded that under Chinese tax law and regulation, the irrecoverable VAT rate is

the difference between the "standard VAT levy" of 17% and the "rebate rate for subject

merchandise," which Commerce found to be 9%. *Id.* Commerce then calculated "irrecoverable

VAT" by applying the difference between these rates, i.e., 8%, to what it considered to be the

export value of the finished merchandise. *Id.* at 31. Commerce deducted this amount from the

starting prices used to determine constructed export price. *See Fine Furniture I*, 40 CIT at __,

182 F. Supp. 3d at 1357-58.

In contesting the Final Results, Fine Furniture did not challenge the Department's

interpretation of § 1677a(c)(2)(B), under which Commerce treated irrecoverable Chinese VAT as

an "export tax, duty, or other charge imposed by the exporting country on the exportation of the

subject merchandise" within the meaning of that term as used in § 1677a(c)(2)(B); nor did Fine

Furniture challenge the Department's calculating Chinese irrecoverable VAT as the 8%

difference between "standard VAT levy" and the "rebate rate."[5] Instead, Fine Furniture claimed

that Commerce erred when it applied the 8% difference in the rates to an amount that was not the

"true export price upon which VAT was refunded upon export and instead recalculated VAT

based on a theoretical value that was distorted by the inclusion of mark-ups for Fine Furniture's

affiliated reseller assessed *after exportation*." *Id.*, 40 CIT at __, 182 F. Supp. 3d at 1358

---

[5] These two issues, which this case does not raise, have been the subject of recent litigation in the Court of International Trade. *See, e.g.*, *Qingdao Qihang Tyre Co. v. United States*, 41 CIT __, __, 2018 WL 1635920, at *3-12 (Apr. 4, 2018); *Aristocraft of America, LLC v. United States*, 41 CIT __, __, 269 F. Supp. 3d 1316, 1321-26 (2017); *Jacobi Carbons AB v. United States*, 41 CIT __, __, 222 F. Supp. 3d 1159, 1186-94 (2017); *China Mfrs. Alliance, LLC v. United States*, 41 CIT __, __, 205 F. Supp. 3d 1325, 1344-51; *Juancheng Kangtai Chem. Co. v. United States*, 41 CIT __, __, 2017 WL 218910, at *11-13 (Jan. 19, 2017).

(quotation marks and internal citation omitted).  According to Fine Furniture, the true export

value was the price at which the subject merchandise was sold by Fine Furniture to Fine

Furniture's affiliated reseller, Double F, not the price, as adjusted, at which Fine Furniture's

affiliated importer sold the merchandise to unaffiliated buyers.  *Id.*, 40 CIT at __, 182 F. Supp.

3d at 1357 ("It appears from the record that Commerce, upon rejecting the VAT amount as

reported by Fine Furniture, recalculated the deduction from the CEP starting price as 8% of an

amount it obtained from the price at which the affiliated importer resold the subject merchandise

to unaffiliated buyers in the United States, which Commerce adjusted downward.") (quotation

marks and internal citation omitted).

      In *Fine Furniture I*, the court directed Commerce to reconsider its method of determining

its deduction from the CEP starting prices, reasoning that Commerce had not reconciled its

method with record evidence regarding the basis upon which VAT actually was incurred.  *Fine

Furniture I*, 40 CIT at __, 182 F. Supp. 3d at 1358-59.  In the Remand Redetermination,

Commerce, changing its earlier decision, decided to use the transfer price to Double F to

calculate irrecoverable VAT.  Commerce found "[u]pon further examination of the record" that

"Fine Furniture certified that the transfer price to Double F is the export price 'used as a basis for

VAT'" and that "[w]e have no information that contradicts these certified statements."  *Remand

Redetermination* at 9 (quoting a Fine Furniture questionnaire response).  No party objects to this

resolution of the VAT issue raised by Fine Furniture, which the court sustains.

2. Selection of Financial Statements for Determining Financial Ratios

      Section 773(c)(1) of the Tariff Act, 19 U.S.C. § 1677b(c)(1), provides generally that the

normal value of subject merchandise from a nonmarket economy country be determined "on the

basis of the value of the factors of production utilized in producing the merchandise," plus "an

amount for general expenses and profit plus the cost of containers, coverings, and other

expenses."[6]   Commerce typically calculates surrogate values for factory overhead expenses,

selling, general & administrative ("SG&A") expenses, interest expense, and profit, by

calculating and applying "financial ratios" derived from the financial statements of one or more

producers of comparable merchandise in the primary surrogate country.  *See* 19 C.F.R.

§ 351.408(c)(4).  Commerce stated that in choosing between multiple sets of financial

statements, it considers the quality, specificity, and contemporaneity of the data.  *Remand*

*Redetermination* 17 & n.65.  In this case, the Department selected the Philippines as the primary

surrogate country, a selection no party contested.  *Decision Mem. for Prelim. Results of*

*Antidumping Duty Admin. Review: Multilayered Wood Flooring from the People's Republic of*

*China*, A-570-970, ARP 11-12, at 13-14 (Int'l Trade Admin. Nov. 18, 2013), *available at*

http://enforcement.trade.gov/frn/summary/prc/2013-28100-1.pdf (last visited June 6, 2018)

("*Prelim. Decision Mem.*").

The record contained numerous sets of financial statements of Philippine producers of

multilayered wood flooring.  For the Final Results, Commerce calculated financial ratios for Fine

Furniture using data in the 2011 financial statements of two of those producers, Richmond

Plywood Corporation ("RPC") and Tagum PPMC Wood Veneer, Inc. ("Tagum").  *Final I&D*

*Mem.* at 24-26.  Fine Furniture claimed that Commerce should not have relied upon the financial

statements of RPC, alleging that the statements were inaccurate and incomplete and that the

record showed that RPC, unlike Fine Furniture, was not an integrated producer of multilayered

---

[6] A "nonmarket economy country" is defined in 19 U.S.C. § 1677(18)(A) as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."

wood flooring. *Fine Furniture I*, 40 CIT at __, 182 F. Supp. 3d at 1360-61.  Furthermore, Fine

Furniture claimed that the Department erred in declining to use for its financial ratios the

financial statements of several other companies in the Philippines.  *Id.*  Fine Furniture argued

that Commerce erred in finding that one of those companies, Mount Banahaw Industries, Inc.,

("Mount Banahaw") was not an integrated producer.

In *Fine Furniture I*, the court directed Commerce to reconsider its decision as to the

information used to calculate Fine Furniture's financial ratios, which decision based those ratios

exclusively on the financial statements of Tagum and RPC.  *Id.*, 41 CIT at __, 182 F. Supp. 3d

at 1361.  The court concluded that "[i]n excluding the Mount Banahaw statements from the

calculation of Fine Furniture's financial ratios, Commerce failed to address Fine Furniture's

argument . . . that Mount Banahaw actually was an integrated producer."  *Id.*, 41 CIT at __,

182 F. Supp. 3d at 1360.  The court explained that Commerce was obligated to consider this

argument and directed that "Commerce must reconsider the matter and decide, based on findings

supported by substantial record evidence, which financial statement or statements are most

appropriate for calculating Fine Furniture's financial ratios."  *Id.*, 41 CIT at __, 182 F. Supp. 3d

at 1361.  The court declined to consider at that time the several other grounds on which Fine

Furniture based its challenge to the Department's selection of financial statements, noting that

some of those grounds may be mooted upon remand.  *Id.*  In its subsequent opinion, the court

explained that the scope of the remand order was not limited to determining whether Mount

Banahaw was an integrated producer but extended to all of the Department's findings with

respect to the selection of surrogate company financial statements.  *Fine Furniture II*, 41 CIT

at __, 2017 WL 2928783, at *3.

In the Remand Redetermination, Commerce found that Mount Banahaw, Tagum, RPC, and Philippine Softwoods Products, Inc. ("PSP"), were, like Fine Furniture, integrated producers of veneer from log sources.  *Remand Redetermination* at 14.  Commerce chose the 2012 financial statement of Mount Banahaw and the 2011 financial statements of Tagum for use in redetermining Fine Furniture's financial ratios.  *Id.* at 15.

Commerce decided upon further examination that the 2011 financial statement of RPC, which it had used for the Final Results, should not be used for the Remand Redetermination because Commerce found it to be incomplete.  *Id.* at 14-15.  In the Remand Redetermination, Commerce also decided that the 2011 financial statement of PSP should not be used because it is incomplete.  *Id.* at 15 ("Specifically, page 7 begins with an incomplete sentence regarding income taxes, and ends with an incomplete sentence regarding 'Provisions and Contingencies.'").[7]

In the Final Results, Commerce concluded that the 2011 and 2012 financial statements of another Philippine producer of multilayered wood flooring, Winlex Marketing Corporation ("Winlex"), should not be used because the document comprising those statements appears to have missing text and reached that same conclusion in the Remand Redetermination.  *Id.* at 14, 18-19.  Commerce also concluded in the Final Results that the 2012 financial statements of Mega

---

[7] The Remand Redetermination states in a summary at the beginning, apparently in error, that the Department has decided to rely on "the 2011 financial statements of *Philippine Softwoods Products, Inc. (PSP)* and the 2012 financial statements of Mount Banahaw Industries, Inc. (Banahaw)."  *Remand Redetermination* at 2 (emphasis added).  Because the Department also states specifically in the Remand Redetermination that it decided not to use the 2011 financial statement of Philippine Softwoods Products because it found it to be incomplete, *Remand Redetermination* at 15, the court disregards this error.  The Department concludes its discussion of the issue by stating that "we have recalculated surrogate financial ratios for Fine Furniture based on the 2011 financial statements from *Tagum* and the 2012 financial statement from Banahaw."  *Id.* (emphasis added).

Plywood Corporation ("Mega Plywood"), another Philippine multilayered wood flooring

producer, should not be used because the company received from shareholders a non-interest

bearing loan with no call period.  *Id.* at 17; *see also Final I&D Mem.* at 24.  Commerce again

reached that conclusion in the Remand Redetermination.  *Remand Redetermination* at 19-20.

In its comments on the Remand Redetermination, Fine Furniture agreed with the

Department's decision not to use the financial statements of RPC.  Fine Furniture's

Comments 11.  Fine Furniture also agreed with the Department's determination that Mount

Banahaw was an integrated producer and that its financial statements should be used in the

calculation of its surrogate financial ratios.  *Id.* at 11-12.  Fine Furniture disagreed with the

Department's basing its financial ratios only on the statements of Tagum and Mount Banahaw,

arguing that the Department's decisions not to use also the financial statements of Winlex and

Mega Plywood were not supported by substantial evidence.  *Id.* at 12.

Commerce continued to exclude the Winlex financial statements in its Remand

Redetermination "because of a missing note regarding 'Property, Plant, and Equipment,'

identified as Note 9."  *Remand Redetermination* at 16-17 (footnote omitted).  Fine Furniture

argues that the "obvious reason for the allegedly 'missing' Note 9" is that Winlex's balance sheet

shows no expenses recorded under Property, Plant and Equipment and that, therefore, there was

no logical reason to include a descriptive note.  Fine Furniture's Comments 12-13.  Further, Fine

Furniture maintains that the missing information is irrelevant because the Department does not

use property, plant, and equipment information in its calculation of financial ratios.  *Id.* at 13-14.

Fine Furniture concludes its argument by asserting that because Commerce rejected the Winlex

financial statements based solely on the omission of "superfluous and irrelevant" information in

Note 9, its decision was unsupported by substantial evidence and the court "must remand to

Commerce with instructions to use the Winlex financial statements to calculate Fine Furniture's

financial ratios." *Id.* at 14.  In reply to these arguments, defendant acknowledged Fine

Furniture's explanation that Note 9 may have been omitted simply because no value was

ascribed to property, plant, and equipment but argues that Commerce permissibly "opted to

avoid unsupported speculation, considering that the record otherwise contained two useable

statements for calculating Fine Furniture's financial ratios."  Def.'s Reply 15.

 The record evidence supports the Department's decision not to use the Winlex financial

statements.  Note 9 is indeed missing from the text of the document comprising the financial

statements for the years ending December 31, 2011 and December 31, 2012 as that document

exists on the record.  *See Letter from deKieffer & Horgan, PLLC to Dep't of Commerce re:*

*Surrogate Values for the Preliminary Results* at Ex. 7 (Aug. 6, 2013) (P.R. Doc. 419), ECF

No. 172-1 ("*Winlex Financial Statements*").  It is the only note that appears to be missing.

Commerce opined in the Remand Redetermination that Fine Furniture's "zero value"

explanation, "while plausible, is problematic because 'Note 6: Trade Receivables' on the same

page does appear, even though there are no reported values."  *Remand Redetermination* at 18

(footnote omitted).  "Thus, it is also possible that all text on the bottom portion of the page,

including 'Note 9' and any other information, was omitted from the financial statement on the

record."  *Id.*

 It is not clear from the record whether Note 9 once existed and is actually missing from

the text or was intentionally omitted from the document due to the zero value, and there is no

record information that resolves this question.  The apparent omission that caused Commerce not

to use the Winlex statements may be characterized as minor or unimportant, but the record fact is

that the two sets of financial statements Commerce used did not raise a similar issue.  While

Commerce is required to use the best available information, the possible discrepancy in the Winlex statements is a sufficient ground for it to invoke its practice of not using financial statements that appear to be incomplete if an alternative that does not have that possible flaw is available on the record.  Fine Furniture's argument that Commerce would not have used the information in Note 9 whether or not the value was zero is unavailing because the possible discrepancy reasonably served as a reason to avoid using the financial statement in light of alternatives.  In summary, the question posed by the issue of the Winlex statements is not whether Commerce permissibly could have found these statements acceptable but whether the record *required* it to do so.  Fine Furniture's arguments fall short of convincing the court that Commerce erred in making its selection from among the choices available on the record.

        In the Remand Redetermination, Commerce maintained its decision in the Final Results not to use the financial statements of Mega Plywood, basing its decision on evidence that the company received non-interest-bearing loans or advances from shareholders with no definite call period.  *Remand Redetermination* at 19 & n.67; *see also Final I&D Mem.* at 24.  Fine Furniture argues that Commerce was required to include the Mega Plywood financial statements in calculating the surrogate financial ratios.  Fine Furniture's Comments 14-15.  Fine Furniture argues that the decision not to do so is unsupported by substantial evidence because, as to the Philippines, "information on the record establishes that such shareholder advances are temporary corporate capital infusions that occur in the ordinary course of business" and because "Commerce could have imputed an interest expense if it needed to perfect the financial statements."  *Id.* (internal citation omitted).  Neither argument is persuasive.  Loans or advances from shareholders may be a routine practice in the Philippines, but the problem Commerce sought to address was not whether the loans or advances are irregular or unusual.  Instead,

Commerce was concerned with possible distortion in the calculation of financial ratios should

the affected financial statement be used.  *See Remand Redetermination* at 19.  Commerce did not

act unreasonably or contrary to record evidence in concluding that the loans or advances could

distort information upon which it would rely, particularly with respect to the Department's need

to calculate an interest expense.  Fine Furniture argues that "[e]ven if Commerce were justified

in its determination that Mega Plywood's financial statements should have an interest expense

associated with stockholder advances, Commerce did not have to reject the statement for this

reason" and "should have adjusted the financial ratios by adding an interest expense rate based

on publicly available rates on the record."  Fine Furniture's Comments 16.  Imputing an interest

rate based on information not specific to the producer represented by the financial statement is a

less-than-ideal solution when financial statements are on the record that are not affected by the

problem Commerce identified.  In short, Fine Furniture has not demonstrated that, given the

available alternatives, Commerce made an impermissible choice in deciding not to use the Mega

Plywood statements.

### 3. Surrogate Value for the Electricity Input

"Commerce, as a general matter, is to determine the normal value of subject merchandise

from a nonmarket economy country 'on the basis of the value of the factors of production

utilized in producing the merchandise,' plus certain additions."  *Fine Furniture I*, 182 F.

Supp. 3d at 1369 (quoting 19 U.S.C. § 1677b(c)(1)).  According to the statute, "the valuation of

the factors of production shall be based on the best available information regarding the values of

such factors in a market economy country or countries considered to be appropriate by the

administering authority."  19 U.S.C. § 1677b(c)(1).  In determining what constitutes the "best

available information," the Department's practice is to consider whether surrogate value data is

"publicly available, contemporaneous with the period of review, representative of a broad-market average, tax- and duty-exclusive, and specific to the input." *Remand Redetermination* at 10-11 (footnote omitted). According to Commerce, "[t]here is no hierarchy among these criteria." *Id.* at 11 & n.38 (citing *Xiamen Int'l Trade and Industrial Co. v. United States*, 38 CIT __, __, 953 F. Supp. 2d 1307, 1312-13 (2013) ("Commerce has not identified a hierarchy among these factors, and the weight accorded to a factor varies depending on the facts of each case.")).

For the Final Results, Commerce calculated a surrogate value for Fine Furniture's electricity usage based on data provided to the record in a surrogate value submission of the Coalition. From these data, Commerce calculated an average of the electricity rates for industrial users in two locations in the Philippines, Naga City and Iriga City/Pili, as listed in an online publication titled "Doing Business in Camarines Sur." *Final I&D Mem.* at 58-59 & n.240 (citing *Letter from Levin Trade Law, P.C. to Dep't of Commerce re: Multilayered Wood Flooring from the People's Republic of China* at Ex. 1, 1-8 (May 24, 2013) (P.R. Doc. 310), ECF No. 150-1 ("*Camarines Sur Data*")). These data yielded an electricity rate of 7.8139 Philippine pesos per kilowatt hour (PHP/kWh). This rate is an average of the industrial electricity rates listed in the online publication for Naga City (7.7287 PHP/kWh) and Iriga City/Pili (7.8990 PHP/kWh).

Fine Furniture submitted to the record during the review electricity rates of the Philippines National Power Corporation ("NPC") pertaining to the regions of Luzon (the region that includes Camarines Sur), Mindanao, and Visayas. *Letter from Mowry & Grimson, PLLC to Dep't of Commerce re: Post-Preliminary Submission of Publicly Available Information to Value Factors* at Ex. 2 (Dec. 18, 2013) (P.R. Doc. 518), ECF No. 183-1) ("*NPC Data and Supplemental Information*"). The data included individual rates for each of the 19 months of the

period of review ("POR") (May 2011 through November 2012) for each of the three regions, for

a total of 57 separate monthly rates.  *Id.*  Fine Furniture calculated from these data an average

country-wide electricity rate of 4.1609 PHP/kWh for the 19-month POR.  Fine Furniture

previously argued before the court that the Camarines Sur data, in comparison to the NPC data,

are not the best available information because they do not represent a broad market average,

because they are not contemporaneous with the period of review, and because there is no

evidence on the record that the rates therein were exclusive of taxes and duties.  *Fine Furniture I*,

40 CIT at __, 182 F. Supp. 3d at 1369-70.

Commerce did not address the issue of tax and duty exclusivity of the Camarines Sur data

in its Final Issues and Decision Memorandum, instead expressing a preference for the Camarines

Sur data, which in setting forth specific rates for industrial users offered "greater specificity than

NPC."  *Final I&D Mem.* at 58-59 (footnote omitted).  In *Fine Furniture I*, the court ordered

Commerce to "consider on remand the argument Fine Furniture grounds in a claimed lack of

record evidence that the Camarines Sur Doing Business rates are exclusive of taxes and duties."

182 F. Supp. 3d at 1371.  The court did not rule on Fine Furniture's other arguments at that time,

reasoning that they "may be rendered moot by the Department's decision on remand."  *Id.*

In the Remand Redetermination, Commerce again chose the Camarines Sur data over the

National Power Company data.  Commerce acknowledged that "there is evidence that the NPC

data are exclusive of taxes and duties, and that there is no similar evidence regarding whether the

Camarines Sur data are either inclusive or exclusive of taxes or duties."  *Remand*

*Redetermination* at 11.  Nevertheless, Commerce "continue[d] to find that the Camarines Sur

data are the best available information for valuing electricity" because "the enhanced specificity

provided by the Camarines Sur data outweighs the absence of conclusive evidence regarding the

tax- and duty-exclusivity of those data." *Id.*  The Department explained that it "has a strong preference for industrial consumption, if discernible, as the purpose of the electricity rate data in this instance is to apply the rate to a wood flooring respondent that is an industrial user of electricity, rather than a commercial or residential user." *Id.* at 12.  In its comments on the Remand Redetermination, Fine Furniture again argues that the NPC data are superior to data in the Doing Business in Camarines Sur report when considered according to the factors of contemporaneity, broad market average, and exclusivity from taxes and duties.  Fine Furniture's Comments 3-4.

The criterion of exclusivity from taxes and duties favors the NPC data, as Commerce has acknowledged that the record evidence shows the NPC data to satisfy this criterion while the same cannot be said of the Camarines Sur data.  *See Remand Redetermination* at 11.  Of the remaining four criteria—public availability, contemporaneity with the period of review, representativeness of a broad-market average, and specificity to the input—the record shows, and no party contests, that the "publicly available" factor is met by both competing sets of data.  *See* Fine Furniture's Comments 4.

The application of the contemporaneity factor remains in dispute between the parties.  In the litigation before the court in *Fine Furniture I*, Fine Furniture claimed the data relied on by the Department were not contemporaneous with the POR because "the rate reported in *Doing Business in Camarines Sur* is considerably out of date, as it has not changed since at least 2009." Fine Furniture's Br. 41 (internal citation omitted).  Fine Furniture based this argument on record information showing that the industrial electricity rates specified by the Doing Business in Camarines Sur report in this review were the same as the rates used in a separate review for which the POR was January 1, 2009 to December 31, 2009.  *Id.*

In the Remand Redetermination, as in the Final Results, the Department bases its

contemporaneity finding for the Doing Business in Camarines Sur report on a "2012" copyright

date contained in a footer on the Doing Business in Camarines Sur webpage.  *Remand*

*Redetermination* at 23; *see also Camarines Sur Data*.  According to Commerce, "there is no

other indication that the electricity data is for a period other than 2012," and "Fine Furniture does

not cite any evidence undermining this finding, beyond its belief that it defies 'common sense'

that the rates have not changed since 2009."  *Remand Redetermination* at 23.  Commerce noted

Fine Furniture's argument, based on the NPC data, that electricity rates in the Philippines

fluctuate over time, and that the unchanged rates shown in the Camarines Sur data therefore must

be out of date.  *See Remand Redetermination* at 21 (footnote omitted) ("In support of its

argument, Fine Furniture notes that the more reliable NPC data . . . show that the electricity rates

include variable adjustment costs that fluctuate over time.").  Commerce did not consider this

evidence "probative" with respect to the particular rates specified in the Camarines Sur data.

*Remand Redetermination* at 12 (footnote omitted) ("[T]here is no probative evidence on the

record suggesting that the [Camarines Sur] information is outdated or somehow relates to a

different period of time.").

Before the court, Fine Furniture reasserts its claim that record evidence indicates the data

on the Doing Business in Camarines Sur webpage have not changed since 2009 and could not

possibly be contemporaneous with the May 26, 2011 through November 30, 2012 POR given

that electricity markets are prone to fluctuation, as demonstrated by the NPC data.  Fine

Furniture's Comments 4-6 (citing *Camarines Sur Data*; *Letter from Levin Trade Law to Dep't of*

*Commerce re: Multilayered Wood Flooring from the People's Republic of China* at Ex. 1, 9-11

(May 24, 2013) (P.R. Doc. 310), ECF No. 150-1 ("*Wooden Bedroom Furniture Mem.*");[8] *NPC Data and Supplemental Information*).   Fine Furniture also objects to the Department's reliance on the 2012 copyright date on the Doing Business in Camarines Sur webpage.   According to Fine Furniture, "[n]othing indicates that the 2012 copyright has anything to do with the electricity rates shown earlier on the webpage."  Fine Furniture's Comments 6.   Rather, Fine Furniture argues, "[i]t is common knowledge that a website can be redesigned without the web host changing the substantive information presented on that website and it appears that is exactly what happened here."  *Id.*  Fine Furniture also argues that whereas the NPC data are from the original source, the government-owned power company, the Camarines Sur publication is a secondary source that does not identify its primary source for the electricity rates.  *Id.* at 10.

Defendant responds that Commerce "declined to draw unsupported inferences" from the unchanged Camarines Sur rate data and the fluctuation of the NPC data and "instead relied on actual record evidence showing that the copyright date of the Camarines Sur website was 2012." Def.'s Reply 11 (internal citations omitted).   In response to Fine Furniture's argument that "the existence of a copyright date is not 'definitive' evidence regarding contemporaneity," defendant submits that "Commerce's factual findings must only be supported by substantial evidence."  *Id.* (internal citation omitted).

Even if it were presumed (despite certain record evidence to the contrary) that the 2012 copyright date is the date actually applying to the electricity rate data in the Camarines Sur publication, remaining evidence still would show that the NPC data are superior to the

---

[8] Exhibit 1 contains both a screenshot of the Camarines Sur Data, showing a copyright date of "2012" in a footer on the final page, and a Factor Value Memorandum dated January 31, 2011 for the January 1, 2009 to December 31, 2009 review period at issue in a prior antidumping duty administrative review of wooden bedroom furniture from the People's Republic of China, which cites the Doing Business in Camarines Sur webpage.

Camarines Sur data with respect to contemporaneity.  The NPC data are presented for each of the

19 months of the POR whereas the Camarines Sur data still would pertain only to the eleven

months of the POR that occurred during 2012.

The remaining two criteria, broad market average and specificity to the input, point in

opposite directions.  Commerce acknowledged in the Remand Redetermination that the "NPC

rates cover a broader geographical area than the Camarines Sur rates."  *Remand Redetermination*

at 24.  Fine Furniture argues that its surrogate value submission provided data allowing

calculation of a country-wide electricity rate, having been obtained from the National Power

Company, the government-owned Philippine power supplier, and covering all three main regions

in the country, Mindanao, Visayas, and Luzon.  Fine Furniture's Comments 8, 10.  In contrast,

the Camarines Sur data pertain to only two locations, Naga City and Iriga City/Pili, in the

Camarines Sur area of Luzon.  Record population data (for 2010) show that Camarines Sur as a

whole had a population of 1,822,371, which was less than 2% of the total population of

92,337,852 for the Philippines; the record does not contain data on the portion of the Camarines

Sur population comprised of the populations of Naga City and Iriga City/Pili.  *NPC Data and*

*Supplemental Information*.

Because they pertain to only two locations and to a very small percentage of the

Philippine population, the electricity rates listed in the Camarines Sur publication cannot be said

to be representative of the Philippines as a whole.  They also are unrepresentative in another

respect: as shown by the NPC data, they are substantially higher than the rates for the Philippines

as a whole and even are significantly higher than the average rates for Luzon, the region in which

Camarines Sur is located.  As demonstrated by the NPC data, the average of the 19 monthly rates

for Luzon is 5.3005 PHP/kWh; the average for Mindanao is 2.8938 PHP/kWh, and the average

for Visayas is 4.2884 PHP/kWh.  *See NPC Data and Supplemental Information*.  The Naga City

rates averaged 6.9292 PHP/kWh (the average of the 6.3147 PHP/kWh residential rate, the 7.7287

PHP/kWh industrial rate, and the 6.7441 PHP/kWh average of the two commercial rates), and

the six listed Iriga City/Pili rates averaged 7.9577 PHP/kWh.  *See Camarines Sur Data*

   Commerce made its selection based on its specificity criterion.  The other criteria either

were neutral (public availability) or favored the NPC data (contemporaneity with the POR, tax

exclusivity, and broad market average).  There may be situations in which the criterion of

specificity to the input may be the controlling criterion even if constituting the only criterion

supporting the Department's choice, but based on the record evidence this is not one of those

situations.  The record in this review does not support a finding that the best available

information is the evidence of record that pertains solely to industrial users of electricity.  Here,

that evidence is extremely limited in scope (obtained from only the two locations in Camarines

Sur), substantially divergent from electricity rates for the country as a whole, and not

substantially divergent from the non-industrial rates for Naga City and Iriga City/Pili.  The

record evidence shows that electricity rates vary so widely in the Philippines that the major

determinant of the cost of electricity is the location within the country; this factor strongly

supports the use of a country-wide rate for the Philippines, which is the Department's chosen

surrogate country.  The record does not support a finding or inference that electricity rates for

industrial customers in the Philippines typically are substantially different than other electricity

rates.  In valuing the electricity input at 7.8139 PHP/kWh, the average of the industrial rates for

Naga City (7.7287 PHP/kWh) and Iriga City/Pili (7.8990 PHP/kWh), Commerce is using a rate

for industrial customers only, but that rate, while varying substantially from the country-wide

rates (which averaged 4.1609 PHP/kWh during the POR) does not vary substantially from the

average of all the rates (for all types of customers) for the two Camarines Sur locations (which is

7.6148 PHP/kWh).[9]

In summary, the record does not contain substantial evidence that supports a finding that

the industrial electricity rates for Naga City and Iriga City/Pili are the "best available

information" on the record with which Commerce could have valued Fine Furniture's electricity

usage.  In preparing a new determination in response to this Opinion and Order, Commerce must

reconsider its surrogate electricity value and ensure that the result is supported by substantial

evidence on the record.

### 4. Commerce May Apply the Fine Furniture Antidumping Duty Rate to the Separate Rate Plaintiffs

In the Remand Redetermination, the Department announced its decision that the

"Separate Rate Plaintiffs will be assigned the margin assigned to Fine Furniture." *Remand

Redetermination* at 26.[10]  The Separate Rate Plaintiffs support this decision, arguing that they

should be assigned whatever rate ultimately is determined for Fine Furniture, and no party

commenting on the Remand Redetermination objects.  The court, therefore, sustains a decision to

---

[9] For only one of the two locations in Camarines Sur, Naga City, was the industrial rate ("industrial with demand," 7.7287 PHP/kWh) higher than the other listed rates (residential, 6.3147 PHP/kWh; commercial with demand, 6.7145 PHP/kWh; and commercial without demand, 6.7737 PHP/kWh).  For Iriga City/Pili, the industrial rate (7.8990 PHP/kWh) was comparable to, but lower than, the residential rate (7.9751 PHP/kWh), the rate for irrigation (8.3038 PHP/kWh), and the public building rate (7.9974 PHP/kWh).  The other rates listed were: commercial, 7.6830 PHP/kWh; and street lights, 7.8876 PHP/kWh.

[10] While the Remand Redetermination refers to an attached list of 47 separate rate respondents as "the complete list of the Separate Rate Plaintiffs that have been assigned updated rates in these final remand results," *Remand Redetermination* at 26 & n.84, 27-28, this list excludes plaintiff Hangzhou Zhengtian Industrial Co., Ltd.  Because this entity is also a plaintiff in this action, it must be afforded the same treatment as the other Separate Rate Plaintiffs.

assign the Separate Rate Plaintiffs the rate ultimately determined as Fine Furniture's

individually-determined margin.

### III. CONCLUSION AND ORDER

Upon consideration of the *Final Results of Redetermination Pursuant to Court Order*

(Aug. 28, 2017), ECF Nos. 337 (conf.), 338 (public) ("Remand Redetermination"), all comments

thereon, and all other filings and proceedings had herein, in conformity with the Opinions issued

in this action, and upon due deliberation, it is hereby

**ORDERED** that the Remand Redetermination be, and hereby is, sustained with respect to the Department's calculation of constructed export price, the selection of surrogate financial statements for use in calculating financial ratios, and the decision to assign to the other plaintiffs and plaintiff-intervenors in this case (the "Separate Rate Plaintiffs") the rate ultimately determined for Fine Furniture; it is further

**ORDERED** that the Department's determination of a surrogate value for electricity usage is not sustained and is remanded for reconsideration and redetermination in accordance with this Opinion and Order; it is further

**ORDERED** that Commerce, within sixty (60) days of the date of this Opinion and Order, shall file with the court a redetermination in response to this Opinion and Order ("Second Remand Redetermination") that complies with this Opinion and Order and redetermines margins accordingly; it is further

**ORDERED** that Fine Furniture, the Separate Rate Plaintiffs (including plaintiff-intervenors), and defendant-intervenor shall have the opportunity to file with the court comments on the Second Remand Redetermination within thirty (30) days of the submission to the court of that decision; and it is further

**ORDERED** that defendant shall have the opportunity to file with the court a response to comments filed on the Remand Redetermination within fifteen (15) days of the filing with the court of the last such comment.

/s/Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated:  June 12, 2018
        New York, New York